Bruce *v.* Schuyler *et al.*

JAMES BRUCE, appellant, *v.* ROBERT SCHUYLER *et al.*, appellees.

*Appeal from Adams.*

If there be two affirmative statutes, or two affirmative sections in the same statute upon the same subject, the rule of construction is, that the one does not repeal the other if both may consist together.

The provisions of a statute should receive such an interpretation, if the words and subject matter will admit of it, as that the existing rights of the public, or of individuals be not impaired.

The doctrine of repeal by implication is not favored by the law, and is never resorted to except where the repugnance or opposition is too clear and plain to be reconciled. The rule of law is, that all laws *in pari materia* are to be construed together, that no clause, sentence or word of any law shall be superfluous or insignificant.

The Revenue Act of 1833, by repealing the fourth section of the Act of 1827 in express terms, or by its general repealing clause, did not, by implication, repeal the twenty fifth section of the same Act. A deed, therefore, made by the Auditor subsequent to the passage of the Act of 1833, for land sold by him for taxes under the laws of 1827 and 1829, is valid.

Courts ought not to declare a law unconstitutional, unless its repugnance to the Constitution is direct and clear.

Any Act which changes the expressed intention of the parties to a contract, or such as results from their stipulations, impairs its validity. It is immaterial as to the extent or manner of the change, whether it be ever so minute, or relates to its construction, its evidence, or the time or manner of its performance. In fine, every conceivable change of a contract impairs its validity and renders it null and void. This constitutional provision extends to and embraces both contracts executed and executory, and as well those entered into by a State, as those made by individuals.

The obligation of a contract is that, which obliges a party to perform his contract, or repair the injury done by a failure to perform. The remedy may be modified by the legislature, but not entirely abolished, and in substituting one word for another, a reasonable remedy must be provided. An Act, therefore, that extinguishes all existing remedy so as to leave no redress, and no means of enforcing a contract would, by operating *in presenti,* impair its obligation.

It is a well settled principle, that the repeal of a law, in which a contract consists, is an infringement of the Constitution. A legislative grant is a contract of this description.

No rule of interpretation is better settled, than that no statute shall be allowed a retrospective operation, unless the will of the legislature to that effect is declared in terms so plain and positive as to admit of no doubt.

The Statute of Limitations, passed on the 17th day of January, 1835, and which took effect on the first day of June of the same year, is not a bar to a recovry, unless the party has been in possession for seven years subsequent to the time it went into effect.

EJECTMENT, in the Adams Circuit Court, brought by the appellees against the appellant, and heard before the Hon. Jesse B. Thomas and a jury, at the September term 1843.

At the trial, the plaintiffs offered in evidence a deed from the Auditor, of the premises in controversy, to Stephen B. Munn, assignee of Zophar Case, dated Nov. 8, 1833, founded upon a sale, on the 12th of January, 1833, for the taxes of 1832, without any evidence to support said deed.   They also deduced title from Munn to them.   Thereupon the parties agreed, that the jury should find a verdict for the plaintiffs, subject to the opinion of the Court upon the sufficiency of the title adduced, and if the Court should be of opinion that it was sufficient, then, whether seven years' possession of the premises by the defendant next preceding the commencement of the suit under title, &c. would be a bar to the suit.

Judgment was entered in favor of the plaintiffs, and the defendant appealed to this Court.

N. Bushnell, for the appellees.

In January, 1833, the land in controversy was sold by the Auditor for the tax of 1832, under the revenue law of 1827, and the amendatory Acts of 1829 and 1831, and in November, 1833, the Auditor executed to the purchaser a deed in the form prescribed by the Act of 1827.   This Act, after classifying the taxable lands and providing for the listing of non-resident lands for taxes, for the rate of taxation and the mode of making out and advertising the delinquent lands for sale, by the fourth section provides, that on the first Monday of January annually, at the State House at the Seat of Government, "the Auditor shall proceed to sell all the lands advertised as aforesaid," or so much thereof as may be sufficient to pay the tax, interest and costs on each tract, and that "the Auditor certify to the treasurer the amount of all sales; and upon receiving the purchase money, the treasurer shall give the purchaser a receipt for the same; and on presenting such receipt to the Auditor, the purchaser shall be entitled to receive at his option either a certificate of such purchase, or a deed" in the form given in that section purporting to be executed by the Auditor.

The twenty fifth section provides that at "all sales of land for taxes whether by the Auditor or sheriff, the officer selling shall, previous to the sale, designate in what part of the tract the part sold shall be located, and shall give his certificate or make his deed accordingly." The revenue law passed Feb. 27th, 1833, provides that the sales for taxes shall be thereafter made by the clerks of the counties in which the lands are situated, at their respective county seats; and by the 18th section it is provided, that "the third, fourth, fifth and twenty seventh sections" of the Act of 1827, "and all other Acts and parts of Acts as come within the purview of of this Act, be and the same are hereby repealed." It is now insisted that by this repeal of the fourth section of the Act of 1827, the power of the Auditor to execute deeds on sales made by him while that section was in force, has been taken away; and that the Auditor's deed given in evidence in this case, having been executed since the repeal, is void. This we deny. On the contrary, we insist that the authority of the Auditor to execute deeds on sales made under this law, existed independent of an express provision of the statute to that effect; that the repeal of this power, whether express or implied, was not within the spirit, object or letter of the Act of 1833; that it was not within the meaning and intention of the legislature; and that, if intended, it was unconstitutional.

I. The Auditor being authorized by the fourth section to sell lands for taxes, and having executed the power while that section was in force, would have been authorized to execute deeds to the purchaser without any express provision upon the subject. That such had always been the understanding of the legislature, a reference to the prior revenue laws will clearly demonstrate. By the Revenue Act of 1819, the first after the organization of the State Government, it was made the duty of the sheriff of the county in which the Seat of Government was situated, to sell non-resident lands for taxes; and of the sheriffs of the several counties to sell the delinquent lands of residents; and the sheriffs selling, were required to give each purchaser "a certificate of the sale

made to him," which should vest the title in the purchaser. Laws of 1819, 314, §§ 6, 9, 10. By the law of 1820-1, the Auditor was substituted in the place of the sheriff to sell the delinquent lands of non-résidents, and was authorized to do "all such acts and things in relation to advertising and selling the lands" as were required of the sheriff at the Seat of Government, by the law of 1819. Laws of 1820-1, 182, § 1. By the law of 1822-3, the Auditor was directed to sell delinquent non-resident lands, and to give a deed to the purchaser which should vest in him the title; and while the sheriffs were required to sell delinquent resident lands situated in their respective counties, no provision was made for giving to the purchaser either a "deed" or "a certificate of sale," although the law of 1819, authorizing the sheriff to execute such certificates, was thereby repealed. Laws of 1822-3, 204, §§ 7, 13, 30. The law of 1824-5, prohibits the sale of resident lands by the sheriffs, but requires the sheriffs to be furnished with a list of the taxable lands both of residents and non-residents, and to collect the taxes and report to the Auditor, who is directed to "advertise and sell" all the delinquent lands on such list in the same manner as the property of non-residents. Laws of 1824-5, 173, §§ 2, 5, 8. And by the fourteenth and seventeenth sections, the Auditor was also directed at every sale "to offer for sale" all lands that had been or might thereafter be struck off to the State. So again, by the law of 1827, the Auditor was required to sell certain lands for taxes. Laws of 1826, 92, § 8. But in neither of the three last cases did the statutes make any provision for securing to the purchaser a deed, a certificate of sale, or any other evidence of his purchase. Thus, by virtue of these statutes, delinquent lands were to be sold, at one time by the Auditor, at another by the sheriff; at one sale "a certificate of sale," at another "a deed" was to be executed to the purchaser; and at still a third, the Auditor or sheriff was authorized to execute neither a certificate or deed, except as the power to convey could be implied from the mere power to sell. Of the seven cases enumerated in these statutes for the sale of delinquent lands, in two only is the power to execute

any form of conveyance expressly given; in all the others it must be supplied, if at all, by implication from the power to sell; while in all the sales provided for, the language of the statute as to what shall be sold is substantially the same, showing a clear intention on the part of the legislature that in each case the land, and not merely an interest in it, be sold and the title vested in the purchaser. Even in those two cases in which a deed or certificate of sale was expressly authorized, no form was provided for either of them. This was left to the discretion of the officer selling. To remedy this inconvenience was passed the law of 1826, having for its sole object to provide the form of the deeds to be thereafter executed by the Auditor, whether on prior or future sales. Laws of 1826, 18, § 1. This statute contains no new grant of power to the Auditor. It does not purport to confer on him the authority to execute deeds on past sales. On the contrary, it clearly recognizes the power, and simply prescribes the mode of its execution. It also further proves, if further proof were required, that on prior sales, it was in all cases the land and the title to it that was sold; for this deed, when executed in the form prescribed, is, without any distinction of past or future sales, declared "to vest the title in the purchaser."

In this state of things was passed the law of 1827, the Act under consideration. This was a mere revision of the revenue system, collecting into one Act the various provisions of six statutes, embodying all of the principles and the useful details of prior legislation on the subject, with such other details as experience suggested. The fourth section confers upon the Auditor the power to sell, and upon the purchaser the right to a deed in the prescribed form. By the twenty fifth section the power to execute deeds is given in express terms. Strike out this latter section and would not the authority of the Auditor to execute deeds still remain? Would not the right of the purchaser to receive a deed, as established by the fourth section, impose on the Auditor a correlative duty, and imply the power to make it? Would not this power be also as forcibly implied from the power to sell? That such

has always been the understanding of the legislature, we have already seen.   That it is also the law' seems hardly doubtful. The idea of a sale of land in this State includes within it, as a matter of law, the idea of a conveyance.   This is not only the usual, it is the necessary mode of effecting a sale.   With us there are no charters of feoffment deriving their efficacy from the livery of seizin; no transmission of title by mere acts *in pais;* but only by deed, by some mode of conveyance deriving its effect from our local statutes, and containing apt terms to pass the title.   The recording law, the Statute of Frauds and of conveyances, the whole system of State legislation on the subject of land titles, point to and establish the conclusion that titles to land can be affected only by evidence in writing. It is the "deed or other conveyance in writing, signed and sealed by the party making it," which, by the law of 1827, of the same session which authorized the sale in this case, is declared to be "sufficient for the selling of any lands, tenements or hereditaments in this State," so as "to vest the title in the purchaser."   Laws of 1827, 95, § 1.   A sale of lands without a conveyance in some form is, therefore, legally impossible.   It not only cannot be proved, it cannot exist.   A lost deed and a sale by it may be established by sufficient evidence, but in a case where no deed has ever existed, there can be neither sale nor proof.

Thus take from the Auditor the power to execute deeds, and the power to sell is nugatory.   It is nugatory as a matter of law.   It would be equally so as a matter of fact.   No person would purchase lands at tax sales unless he could obtain a title; and the very object of the statute would be defeated by the inability of the Auditor to sell, which the statute authorizes and requires him to do.

But it is said that this is a summary statute and that such statutes must be construed strictly.   The principle of strict construction can have no application here.   It relates either to the subject matter of the statute, or to the acts of the officer under it.   By the former no right can be affected, unless it falls within the clear intention of the statute; by the latter it can be affected only in the precise mode pointed out, for one mode being prescribed, all others are forbidden.   But here,

as to the right to be affected, there is no dispute. It is the clear intention of the statute, that the delinquent lands be sold and the title vested in the purchaser. The mode of proceeding preliminary to the sale is prescribed, and must be strictly pursued. But what evidence is the Auditor to furnish the purchaser of his purchase and title? Is it to be a certificate, a contract, or a deed? And what are to be the terms of each? On this point, the law by the supposition is silent; and according to the argument we are answering, it can be neither. For this goes not to one, but to every case of implied power. The same principle of construction, which denies to the Auditor the implied power to make a deed, equally denies to him the implied power to make a valid certificate or contract; it equally denies to him the power to insert terms not expressly contained in the statute, and where the statute is silent as to the terms, the certificate, the contract or the deed must also be silent; no terms, however appropriate to the power to sell, can find a lodgment there. And must the sale be therefore merely verbal? And what shall be the terms of this verbal sale? Here, again, passing over the impossibility of such a sale, the stipulations to be implied from the power to sell, again encounter this narrow principle, and discover to us that we have abandoned the plain and legitimate construction of the statute, for a solecism and an absurdity.

The statute authorizes the Auditor to sell. The argument concedes the power and denies to him every condition under which it can be exercised, keeping "the word of promise to the ear" only "to break it to the hope." It is a general principle that the grant of a power, whether to governments, to individuals, or to corporations, carries with it all of the usual ordinary and necessary means to effectuate the beneficial exercise of the power. Story on Agency, §§ 58–9. *Ventriss* v. *Smith*, 10 Peters, 161; *Wilson* v. *Troup*, 2 Cowen, 199, 233; *Jackson* v. *Hartwell*, 8 Johns. 424; *Pittstown* v. *Plattsburgh*, 18 do. 407, 418; *McCulloch* v. *The State of Maryland*, 4 Peters' Cond. R. 466; *Pomfret* v. *Rickfort*, 1 Saund. 323, and note 6; *Fenn* v. *Harrison*, 3 Term R. 757. Why should a principle, applicable to all other cases

of constitutional and statute law, be denied to this law? In what respect can the execution of a deed, the usual and appropriate method of executing a power to sell, be said to violate a statute on the principle of strict construction, which, while it makes it the duty of the Auditor to sell, neither prohibits that mode nor prescribes any other. This case is even much stronger, for the question here is not merely as to the execution of an implied power, convenient and proper to carry an express power into effect, but it is as to the power of the Auditor to do an act embraced within, and constituting a part of the principle act to be done. We submit, then, that no express authority to the Auditor, to make deeds under the law of 1827 was necessary. It would be implied by the fourth section from the right of the purchaser to receive a deed. It would be more strongly implied from the power to sell, not merely as a convenient incident to that power, but as a component part of the sale itself. How, then, can the repeal of the fourth section, relating to the deed, affect a power previously conferred and existing as full and perfect without it as with it. See *Nance* v. *Howard*, Bre. 183, 185.

II. But we need not rely on this implied power. The power of the Auditor to execute deeds is expressly conferred by the 25th section, and that section the Act of 1833 did not repeal. There can be no doubt that by the 25th section, if standing alone, unaided by the 4th, the power of the Auditor to make deeds in all cases would have been ample. The question then is, are the fourth and twenty fifth sections so connected and dependant on each other, that the repeal of the former also repeals the power expressly conferred by the latter. Here, the gentleman's doctrine of strict construction comes to our aid. By this the words of the statute must be looked to and strictly pursued. That which is expressed in the statute must supercede that which is merely implied. As an express covenant in a deed takes away all implied ones, (*Vanderkarr* v. *Vanderkarr*, 11 Johns. 122, *Grannis* v. *Clark*, 8 Cowen, 36; *Kent* v. *Welch*, 7 Johns. 258;) so the power of the Auditor implied in the fourth section is merged

Bruce *v.* Schuyler *et al.*

and lost in the express grant contained in the twenty fifth. Thus, on the gentleman's own principles, the power of the Auditor to make deeds cannot be derived from the fourth section; 1st, because, as we have seen, any implied power under such a statute is denied, and 2d, because, if it could be implied from that section, the implication is destroyed by the twenty fifth. This power, then, exists wholly independant of the fourth section; and by no logic can the repeal of that section destroy it.

But assuming that it can be deduced from each of these sections, is it still taken away by the repeal of the fourth? The law of 1833 simply changes the place of future sales, and the officer who is to sell the delinquent lands. For the Auditor it substitutes the county clerks, for the Seat of Government, the several county seats. This was the principle, we may say the only object of the law. It was merely a change of convenience. No new principles were adopted; few changes were made even in the details of former statutes. The statute of 1827, itself a revising law, with the supplimental Acts of 1829 and 1831 were all retained, with the exception of such sections as conflicted with this change in the sale, and there, with the law of 1833, thereafter formed the revenue system. The fourth section of the law of 1827 was repealed, as directing the sales to be made by a different officer and at a different place; but, as many lands had been sold by the Auditor for which the purchasers had received no deeds, the twenty fifth section authorizing the Auditor to execute the deeds was retained. Guarded language in the repeal of the fourth section was unnecessary. As the power of the Auditor to make future sales was taken away, no new rights could be acquired under his acts. It only remained to secure and perfect old ones; and what reason could exist for preserving an inferential power to execute deeds under the fourth section, when this power was retained in express terms in the twenty fifth section?

It could not have been the intention of the legislature to deprive purchasers at previous sales, of the benefit of their purchases, by taking away the power of the Auditor to exe-

cute deeds. The whole history, of the State legislation on the subject matter, repels the idea. It discovers a constant solicitude on the part of the successive legislatures to give confidence to the public in the validity of tax titles, as the only means of securing the collection of the revenue; a feeling in which the legislature of 1833 fully participated, as is evident from the eighth, tenth and eleventh sections of the law which make the deed *prima facie* evidence of title, secure the purchaser 100 per cent. on redemptions in two years; and guard most carefully against fraudulent redemptions by minor heirs.

To deduce the repeal of the twenty fifth section from the repeal of the fourth, would, therefore, violate every principle laid down for the construction of statutes. It violates the law which relates to repeals by implication; it violates the clear intention of the legislature; it is at war with all previous legislation on the subject matter; it is not required by the spirit and object of the law 1833; it subverts the rights of third persons, and renders that part of an existing law, the twenty fifth section of that Act, which makes it the duty of the Auditor to execute deeds on sales made by him, entirely nugatory.

We need only refer to a few cases on the construction of statutes—their application to this case is plain. In the construction of statutes, all statutes in *pari materia* are to be taken as one statute; (1 Kent's Com. 463–4; 6 Bac. Abr. tit. *Statute*, Letter I, No. 3; *The Earl of Allsbury* v. ———— ———, Doug. 30; *Nance* v. *Howard*, Bre. 183, 185;) and this, whether the statutes are repealed or unrepealed; ( *Church* v. *Crocker*, 3 Mass. 21–2; 6 Bac. Abr. *Statute*, I, 2;) and each part should be construed with the other and the whole be taken together and so construed that no clause, sentence or word should be superfluous or insignificant. *The Mayor of Baltimore* v. *Howard*, 6 Har. & Johns. 383, 388, 392–3; *Pennington* v. *Coxe*, 1 Peters' Cond. R. 346, 348. The ends contemplated should be considered; ( Comyn's Dig. title, *Parliament*, R. 10 B;) and the statute so construed that no man, who is innocent, be punished or endamaged, (6

Bac. Ab. *Statute*, Letter I, 10;) or the existing rights of the public or individuals be infringed. *Wales* v. *Stetson*, 2 Mass. 143, 146; *Dash* v. *Van Kleeck*, 7 Johns. 486, 495–6, 499, 501–2, 508; *United States* v. *Fisher*, 1 Peters' Cond. R. 421. The intention of the legislature must be looked to. This is the polar star in the construction of statutes and must be followed even where it may seem contrary to the letter. 6 Bac. Abr. *Statute*, I, No. 5; *Church* v. *Crocker*, 3 Mass. 21–2; *Holland* v. *Pearce*, 8 do. 418; *Somerset* v. *Dighton*, 12 do. 393. This intention is sometimes to be collected from the cause or necessity of making a statute, or from the situation of the country at the time of its passage, or from the general system of legislation on the same subject. At other times it may be collected from other circumstances. In whichever of these ways it can be discovered, it should be followed with reason and discretion in the construction of the statute, though contrary to the letter. *Jackson* v. *Collins*, 3 Cowen, 89; 6 Bac. Abr. I, 5; *Preston* v. *Browder*, 3 Peters' Cond. R. 508; 5 Comyns' Dig. title, *Parliament*, R. 10 B ; *Holbrook* v. *Holbrook*, 1 Pick. 250, 254; *Beall* v. *Har-wood*, 2 Har. & Johns. 171. Thus, in delivering the opinion of the Court in the case of *Mendon* v. *The county of Worcester*, 10 Pick. 243, Shaw, Chief Justice, says: "That the statute cannot have a literal construction consistent with the intention of the legislature, we think quite manifest. But we think the statute must have a reasonable construction with reference to the obvious purposes intended to be accomplished, the known rights intended to be secured, a just regard to other and previous legislative enactments for which the present is intended as a substitute." See, also, *Commonwealth* v. *Cambridge*, 20 Pick. 267, 271. So repeals by implication are disfavored. A latter Act will not repeal a former by implication, unless the repugnancy is plain. It has ever been confined to repealing as little of a prior statute as possible. Though seemingly repugnant, they will, if possible, receive such a construction that both may stand; ( *Snell* v. *Bridgewater*, 24 Pick. 297–8; *Goddard* v. *Boston*, 20 do. 408, 410; *Loker* v. *Brookline*, 13 do. 348; *Canal Company*

v. *Railroad Company*, 1 Gill. & Johns. 152, 154;) particularly in a case where the spirit and character of the legislature on the same subject, rebuts the idea that a repeal was intended. *Pease* v. *Whitney*, 5 Mass. 379, 382–3; *McCartee* v. *Orphan Asylum*, 9 Cowen, 507.

III.   But if it should be admitted that the Act of the 27th of February, 1833, standing by itself, repeals the authority of the Auditor to execute deeds, on sales under the law of 1827, we then insist that by another law of the same session, the power is still reserved.   By the eighteenth section of the law of the 27th of February, 1833, the fourth section of the Act of 1827 is repealed; but while this repealing Act was on its passage, a general revising Act was also before the legislature.   This revising law passed on the 2nd of March, 1833, three days subsequent to the revenue law.   It contained a revision of all the laws ·in force at the commencement of the session.   The first section enumerates the laws to be retained, and directs them to be published with the general laws of the session, and gives to the whole the title of the "Revised Laws of Illinois."   The numbers 146, 148 and 149, in the enumeration, embrace the revenue laws of 1827, 1829 and 1831, excepting the fourth section of the law of 1827, and certain other sections having no relevancy to this case.   At the close of the enumeration, the second section of the law provides, that "all Acts and parts of Acts of a general and public nature, passed by any General Assembly heretofore held, and not enumerated in the foregoing section, are hereby repealed; *Provided*, that no proceedings commenced or rights acquired under any of the Acts hereby repealed, shall be in anywise impeded or impaired by the repeal thereof."   Revised Laws of 1833, 434, No's. 146, 148 and 149, and §§ 2, 3.   These two laws having been passed at the same session, relating to the same subject matter, and looking to the revision of the same revenue system, must be construed as one law.   This will give to the proviso in the revising law the same effect as if it had been specifically contained in the revenue law. By the Common Law, every Act of Parliament related back to and took effect from the first day of the session, unless oth-

Bruce *v.* Schuyler *et al.*

erwise provided. 1 Kent's Com. 456; *Satless* v. *Holmes*, 4 T. R. 660. The Act of the 33 Geo. 3, chap. 13, modified the Common Law in this respect, and requires the time of the royal assent to be indorsed on every Act, and from that time it takes effect as a law. Comyn's Dig. title *Parliament*, R. 1. This places an Act of the English Parliament on the same footing with an Act of our Legislature, which, unless otherwise provided, takes effect from the time of its passage. But this doctrine of relation of a statute to the first day of the session, except for the purpose of going into effect, is in no respect affected by the Act of Geo. 3d. For the purpose of construction, every Act still relates to the first day, so that two Acts passed at different times in the same session, will, by relation to the first day, be considered, in contemplation of law, and for the purpose of ascertaining and giving effect to the intention of the legislature, as having passed at the same time. It is considered that the passage of one Act before the other is purely accidental; that the two bills were probably before the legislature at the same time; and that each bill was passed with reference to the other, and in expectation of its passage. *Nares & Pepys* v. *Rowles*, 14 East, 510. In this country it has been frequently decided, that all Acts passed upon the same subject at the same session of the legislature, are to be considered as one law. *The State* v. *Noah*, 3 Iredell, 506; *The State* v. *Rackley*, 2 Blackf. 249; *Kinney* v. *Beverly*, 2 Hen. & Munf. 342–3, per Justice Roane. The reason assigned is, that both Acts were probably before the legislature at the same time, and must have had a necessary relation to each other; and that to adopt a different principle of construction would defeat the obvious intention of the legislature. 2 Hen. & Munf. 343; 14 East, 510.

In this case, we are not left to probabilities. The journals show that both of these laws were progressing, for most of the session, in both houses and at the same time.

The subject of the revenue law of 1833 was introduced into the House as early as the sixth of December, 1832. The bill itself was introduced into the House on the 17th of that month, and from that time it was before the House in its va-

rious stages till the 27th of February, 1833, when it passed the Council of Revision. House Journal, 1832–3, pages 39, 40, 116, 121, 237, 251–2, 348–9, 362, 370, 446, 475–7, 571–2, 625, 665, 674, 682, 695. The bill was reported from the House to the Senate on the 19th of February, 1833, and from thence to the 27th of February it was before the Senate in its various stages. Senate Journal, 1832–3, pages 470, 500, 510, 570, 576, 586.

The subject of the "Revised Laws" was introduced into the House on the 12th, and into the Senate on the 26th of December, 1832, at which time, by a joint resolution of both Houses, the whole subject was referred to the judiciary committees of both houses, and from thence to the final passage of the bill, on the 2nd of March, the subject was before both branches of the legislature in its various stages of progression. House Journal, 1832–3, pages 90, 194, 207, 213, 319–20, 724, 738, 741, 743, 745; Senate Journal, pages 159, 160, 406, 411, 592–3, 637, 638. In contemplation of this revision, and in reference to the passage and publication of the Revised Code, both of these bills are frequently alluded to in the journals, and their progress through the legislature, noted under the title of "Revised Laws," or the "Revised Code." As to the "Revised Laws," see House Journal of 1832–3, pages 351, 382, 536, 606, 735; Senate Journal, pages 261, 296, 500, 568, 628. As to the "Revised Code," see House Journal, pages 502, 507, 508; Senate Journal, pages 402, 430.

The following considerations further enforce the construction now contended for:

1. By the repeal of the fifth section of the revenue law of 1827, the right of redemption from tax sales, both in adults and in minors, is taken away. No saving of their rights any where exists in the statute, unless it is contained in this proviso in the revising law. Will the Courts give these statutes such a construction as will thus annihilate the most meritorious interests connected with tax titles?—and especially, those belonging to minors, who cannot protect their own interests, and who are always particular favorites in Courts?

2. The legislature, by leaving unrepealed the twelfth sec-

tion of the revenue law of 1829, required the Auditor to make out duplicate deeds to those who had lost or might lose deeds executed to them under the revenue law of 1827. Can any reason be assigned why the legislature should wish to leave unaffected the rights of those who had lost their deeds, and to legislate away the rights of those who never had them? Revised Statutes of 1833, 526, § 12.

3.  The legislature, in making the revision, recognize the existence of tax certificates of sale as valid and useful papers, and the subject matter of contracts, and authorizes the Auditor to take acknowledgments of the assignment of these certificates. If, henceforth, these papers were to be regarded as nullities; if tax deeds and titles could no longer be proved under them if they were thereafter, as the opposite party insists, to become valueless, why was their existence and value thus recognized, and all traces of them not stricken from the statute? Revised Laws of 1833, 138, § 2.

4.  The law of 1827 was itself a revising law. All the previous revenue laws were by the forty third section thereof repealed, with a proviso, that "no forfeitures incurred or rights accrued under any of the laws hereby repealed shall be affected by such repeal." Laws of 1827, 338, § 43. By the revising law of 1833, this forty third section is repealed, and with it the rights therein reserved, except as they are saved by the proviso to this revising law. That is, according to the construction we are resisting, the legislature intended by the laws of the 27th of February and of the 2d of March, 1833, to make no saving of rights acquired under the laws and parts of laws repealed by the former law, while by the latter they were careful to reserve rights acquired under similar laws which were repealed in 1827! Why the legislature should have desired to molest rights acquired under the revenue laws previous to 1827, and not to protect rights acquired under similar laws between that time and 1833, it would be difficult to explain, particularly as during the latter period the legislature first set the example of legislating with a special view to the security of tax purchasers; an example which, as we have already seen, the legislature of 1833 followed to

the fullest extent, and which from that time has characterized all the State legislation on the subject matter.

5. The revenue laws of 1827, 1829, and 1831, with the law to be passed in 1833, were to form one law, or one system of revenue laws. It was hence necessary in passing each of the two laws of 1833, the revenue law and the revising law, to compare the one with the other in their progress through the committees and the houses, and to vote on their passage with reference to this comparison. Not only was this necessary to the proper adjustment of the several parts of a system of laws, but from the nature of the case it is impossible that it could have been otherwise. What difference, then, can it make in which law or in what part of the laws the saving of rights is contained?—for having ascertained the intention, of the legislature, the Courts will effectuate that intention whether it is ascertained from the language of the the laws, from the circumstances under which they were passed, or from the object and spirit of the legislation on the subject matter. And how can the Courts separate in giving their construction and effect to statutes relating to the same subject, which were before the legislature at the same time, and which, from their nature and history, the legislature must have joined on their passage?

6. If the fourth section of the law of 1827 was repealed on the 27th of February, 1833, by the revenue law, it was also again repealed on the 2nd of March by the revising law, which was before the legislature at the time of the first repeal. Not being enumerated in the revising law to be published, but expressly excepted out of the publication, it falls within the "Acts and parts of Acts" which were thereby repealed. The legislature, by this repeal of that section on the 2nd of March, acted on it as an existing law and capable of being repealed, while the proviso inserted with a full knowledge of the former Act saving all rights acquired under the laws "thereby repealed," manifests a clear intention in no respect in that session of revisal, to impede or impair rights acquired under the repealed section. So palpable is this, so certain the conclusion in which it results, that if the leg-

islature have power thus to reserve rights; if the intention of the legislature is to govern the reservation; if this intent is to be arrived at in this, as in other cases, by the nature, history and object of the law, by the acts of the legislature as explained by their language, and their language as explained by their acts, it is vain to deny the existence of the reservation here.. To conclude otherwise, we must first overturn all the well established principles governing the construction of statutes, or we must deny the existence of the legislative intent which is so manifest in the statutes that "the way faring man may read and understand."

7. If rights acquired under the laws and parts of laws repealed by the revenue Act of 1833, are not reserved by the proviso of the revising Act, it is an anomaly in the legislation of the State on the subject matter. Our revenue laws have been revised four times since the organization of the State Government, and all laws repealed conflicting with the laws as revised, to wit, in 1827, 1833, 1838–9 and 1844–5. In every revisal, all rights acquired under the repealed laws, have been most amply and carefully preserved, unless the revision of 1833 is an exception. Laws of 1827, 338, § 43; Laws of 1838–9, 23, §63; Revised Laws of 1845, 453, § 109; pages 465, 466; page 470, §4, and page 473, §38.

8. If it was necessary to sustain rights acquired under the repealed sections of the revenue laws of 1827, it might be justly urged that the omission to reserve rights in the repealing section, was through inadvertance, and that as soon as discovered, the defect was cured by the passage of the law of March 2nd, reserving them. We then bring the case within the familiar principle, that where an Act is passed to correct an omission in a former statute of the same session, it relates back to the passage of the first law, and the two must be taken together as if they were one and the same Act, and the first read as containing in itself in words the amendment supplied by the last. New Law Library, vol. 1, No. 2, pages 8 and 9; 2 Dwarr. Stat. 685; 7 Johns. 497; 3 Peters' Cond. R. 511–12.

The reservation of rights in the revising law is, in terms,

ample for the purpóse. In construing such provisos, particularly in revising statutes, the Courts will construe them liberally in order to give effect to the intention of the legislature. *Sweet* v. *Strickland,* 23 Maine, (10 Shepley,) 235, 237; *The People* v. *Livingston,* 6 Wend. 526, 529–30.

IV. But if we are thus far mistaken, if the fourth and twenty fifth sections of the Act of 1827 were absolutely repealed without any reservation of rights, we still insist that the power of the Auditor to execute deeds on prior sales was not thereby destroyed. This would be giving a retrospective operation to the repealing clause, which the Courts will never do except on the most urgent necessity, and in obedience to the clearest expressions of the legislative intention. Thus a statute passed during the pendency of a suit, is not to be construed to affect the suit even as to the mode of proceeding unless such is the manifest intention of the legislature. *Hastings* v. *Lane,* 15 Maine, (3 Shepley,) 134. Even in a case where the statute on which the right of the party in the suit is founded, is absolutely repealed by the subsequent law, *Couch* v. *Jeffries,* 4 Burr. 2460. In Kentucky, where after the commencement of the suit, the occupying claimant law was absolutely repealed and a new law substituted giving new rights, the repeal was held not to relate to past transactions, and judgment was entered under the repealed law. *Fisher* v. *Cockerill,* 5 Monroe, 129, 135, 137–8; *McMicken* v. *The Mayor, &c. of Baltimore,* 2 Har. & Johns. 41, 46. Where there is an absolute repeal of the Statute of Limitations, without any reservation of rights, such repeal will not affect a case on which suit has been commenced. This will not be considered the intention of the legislature, if any other construction will avoid it. *Woat* v. *Winnock,* 3 New Hamp. 473, 483–4; Bre. App. 29. So a law repealing another by implication, still leaves the other in force as to suits commenced previous to the repeal. The Courts in construing repealing clauses will, as in other cases, go against the letter of the clause to prevent giving it a retrospective effe'ct. *Call* v. *Hager,* 8 Mass. 423, 426, 430; *Ogden* v. *Blackledge,* 1 Peters' Cond. R. 411; *Dash* v. *Van Kleek,* 7 Johns. 477; *Osborne* v. *Huger,* 1 Bay, 179.

The answer made to this is, that the cases referred to do not relate to absolute repeals. If a law is in fact repealed, it would seem to make no difference as to the effect of the repeal, by what form of language it is done, whether in express terms or by necessary implication. But aside from this, the objection is founded on a misapprehension of the cases, as an examination of them will show. In the construction of the absolute repealing clause, we find the Courts always applying the same principle of construction, as in the construction of any other part of the law; the end of which is to ascertain and give effect to the intention of the legislature in the use of the repealing clause. *Fischer* v. *Cockerell*, 5 Monroe, 129; *Whitman* v. *Hapgood*, 10 Mass. 437; *Call* v. *Hager*, 8 do. 423; *Thayer* v. *Seavey*, 2 Fairf. 285; *Couch* v. *Jeffries*, 4 Burr. 2460; *Rex* v. *Justices of London*, 3 do. 1456; *McMicken* v. *The Mayor of Baltimore*, 2 Har. & Johns. 41; *Woat* v. *Winnock*, 3 New Hamp. 483–4. In a late English case it is broadly laid down, that wherever a retro-active effect has been given to a repealing clause, it turned upon some peculiar wording of the statute. *Hitchcock* v. *Way*, 33 Eng. Com. Law R. 249.

The cases in which a retro-active effect has been given to the repealing clause, may be reduced to the following:

1. Where the right to be affected, though a vested right, is not reserved by any constitutional provision, and the law manifests a clear intention to affect, modify or bar such right. *Rex* v. *The Justices of London*, 3 Burr. 1456; *Potter* v. *Sturdevant*, 4 Greenl. 158; *Thayer* v. *Seavey*, 2 Fairf. 185.

2. When the right is saved by the repealing law, but the remedy to enforce it is modified, or limited in time, but left available and substantial. *The People* v. *Livingston*, 6 Wend. 526; *Commonwealth* v. *Commissioners &c.* 6 Pick. 508; *Butler* v. *Palmer*, 1 Hill's (N. Y.) R. 324.

3. Where the repealing law acts upon special jurisdictions or criminal prosecutions, and takes away the jurisdiction of the Court. *Commonwealth* v. *Marshall*, 11 Pick. 351; *Same* v. *Kimball*, 21 do. 371; 6 do. 508; 6 Wend. 529–30; *Springfield* v. *Hampden Commissioners*, 6 Pick. 501.

4. Where a law imposes a penalty, the repeal of the law is ordinarily construed as a repeal of the penalty. 1 Kent's Com. 465; *Yeaton* v. *United States,* 2 Peters' Cond. R. 256; *Oriental Bank* v. *Freese,* 18 Maine, (6 Shepley,) 109; *The Commonwealth* v. *Welch,* 2 Dana, 330.

5. Where some peculiar privilege is conferred by statute, it may be taken away by statute. 6 Pick. 508; 6 Wend. 530–31; *Maggs* v. *Hunt,* 12 Moore, 357.

V. We come then to the question, whether the legislature has the power to repeal the law of 1827, so as to destroy the right of the purchaser at tax sale, or so as to take away all remedy for a deed? And, whether, if the power exists, the Courts will give the repealing law such a construction.

A grant by a State is a contract within the meaning of the Constitution of the United States. 3 Story on Const. § 1385; *Ferrett* v. *Taylor,* 3 Peters' Cond. R. 295; *Fletcher* v. *Peck,* 2 do. 308, 321, 322; *Pawlett* v. *Clark,* 3 do. 418; *Green* v. *Biddle,* 5 do. 369; *New Jersey* v. *Wilson,* 2 do. 457; *Dartmouth College* v. *Woodward,* 4 do. 526, 539, 548, 555. So a replevin bond under the statute of Kentucky; (*Lapsley* v. *Brashears,* 4 Litt. 53;) and a judgment *ex delicto,* 7 Johns. 490, per Chief Justice Spencer, are contracts within the protection of the Constitution. So a certificate of purchase under the revenue law of 1827, the law now under consideration, is, by a former decision of this Court, a contract between the State and the purchaser, and the rights of the purchaser must be determined by the law as it stood at the time of the sale. *Garrett* v. *Wiggins,* 1 Scam. 335. Contracts, whether executed or executory, are within the same protection of the Constitution. 3 Story on Const. § 1385.

The obligation of a contract is that which obliges a person to perform his contract, or to repair the injury done by a failure to perform. This obligation consists partly in conscience and partly in the remedy. The perfection of the legal obligation consists in the remedy. *Blair* v. *Williams,* 4 Littell, 36–39, 41–42; *Lapsley* v. *Brashears,* 4 do. 53, 55, 59. The distinction so often heard in Courts between the law of the contract and the law of the remedy no where exists in the

Constitution. That instrument prohibits all legislation which impairs the obligation of contracts. It leaves the remedy to be altered or modified to suit the public will and convenience, provided the alteration does not substantially impair the value or benefit of a contract, or of a right vested under it. If that effect is produced, it is immaterial whether it is done by acting on the remedy or directly on the contract. *Bronson* v. *Kinzie*, 1 Howard's (U. S.) R. 311, 316–17; *Greene* v. *Biddle*, 5 Peters' Cond. R. 369, 373–4. For the legal obligation of a contract consists in the remedy, not in the Court which administers it, nor in the particular mode in which it may be administered. There is no such thing as a vested right in a particular remedy. The State legislatures are competent to make such changes in the remedies provided to enforce contracts as they may think proper, so that a substantial remedy is left. 3 Story on Const. §§ 1375, 1379; 4 Litt. 42, 56; *Commonwealth* v. *Commissioners*, &c. 6 Pick. 508; *The People* v. *Livingston*, 6 Wend. 526; *The People* v. *Tibbetts*, 4 Cowen, 384. But abolishing all remedy impairs the obligation of the contract. It was the protection of this right as connected with this remedy which the Constitution was intended to protect. 3 Story on Const. 1379; *Bronson* v. *Kinzie*, 1 How. (U. S.) R. 317, 319–20. "If," say the Court, in deciding the case of *Call* v. *Hager*, 8 Mass. 423, 430, "the legislature were to undertake to make a law preventing all remedy upon a contract lawfully made and binding on the party to it, there is no question but that such legislature would by such act exceed its legitimate powers; the law would impair the obligation of the contract and be a void act of legislation." Even the case of *Butler* v. *Palmer*, 1 Hill's (N. Y.) R. 328, which evades the constitutional question and sustains the repealing law as being a reasonable limitation law, admits that if the repeal had been peremptory and had in terms taken away all remedy, it would have been unconstitutional. See, also, *Nichols* v. *Bertram*, 3 Pick. 342, 343. The legislature cannot, by express words in a subsequent statute, repeal rights vested under a contract. Rights of action and other executory rights are vested within the

meaning of this rule. *Butler* v. *Palmer*, 1 Hill's (N. Y.) R. 325, 335; *Fletcher* v. *Peck*, 2 Peters' Cond. R. 308; *Cochran* v. *Van Scorley*, 20 Wend. 381, *et seq; Beadlestone* v. *Sprague*, 6 Johns. 101; *The People* v. *Livingston*, 6 Wend. 531; *Varrick* v. *Briggs*, 6 Paige, 332. On this principle, the repeal of a statute in which the contract consists is unconstitutional. *New Jersey* v. *Wilson*, 2 Peters' Cond. R. 537. Even where the power of the legislature to divest vested rights is undoubted, a statute will never be construed as doing this, where it is susceptible of any other construction. Exceptions will be made against the plain letter of the law. *The People* v. *Livingston*, 6 Wend. 530–31; *Couch* v. *Jeffries*, 4 Burr. 2462; *Sayres* v. *Wisner*, 8 Wend. 661; *Fischer* v. *Cockerill*, 5 Monroe, 135, 137–8; *Dash* v. *Vankleek*, 7 Johns. 477; *Call* v. *Hager*, 8 Mass. 426, 430; *The People* v. *Supervisors*, *&c.* 10 Wend. 363. "Where rights are infringed," says Chief Justice Marshall in the case of *The United States* v. *Fisher*, 1 Peters' Cond. R. 425, "where fundamental principles are overthrown, where the general system of the laws is departed from, the legislative intention must be expressed with irresistible clearness to induce a Court of justice to suppose a design to effect such objects." *Somerset* v. *Dighton*, 12 Mass. 383, 385.

But it is said that in this case the remedy is not by the repealing law abolished, that it is merely changed, and that, if the purchaser is entitled to a deed, his remedy since the repeal is by suit against the Auditor under the law of 1829, providing for suits against the Auditor, where the State is interested. Revised Laws, 1833, page 593.

The answer to this is obvious. 1. The statute referred to relates to suits involving moneyed claims only, as is proved by its whole tenor; to controversies in which the State is directly interested, either as debtor or creditor. 2. If the statute can be so construed as to embrace a case like the present, it in no legal sense saves the remedy. According to this statute the right of the purchaser to a deed, once established in Court, must be referred to the legislature, by which the action of the Court may be confirmed or annulled. Till sanc-

tioned by the legislature, both the right of the purchaser and the remedy are suspended. Before the repeal, if the Auditor refused to execute a deed, there was a perfect remedy by the writ of mandamus. This was a remedy administered by a Court of Justice, in the regular course of law, and on well established principles; not the mockery of a remedy to be administered by legislative discretion! When the Constitution speaks of the obligation of a contract, it includes some known means, acknowledged by the municipal law, to enforce it. 3 Story on Const. § 1375; *Johnson* v. *McIntosh,* 5 Peters' Cond. R. 539.

VI. But it is said that if the purchaser, as to his right to a deed and to the title thereby conveyed, is within the protection of the Constitution, still the deed having been executed after the repeal of the law authorizing it, cannot have the effect in evidence given to it by the repealed law as proof of the pre-requisites; that questions of evidence relate exclusively to the law of the remedy, and that in this case a substantial remedy is left, the purchaser being simply remitted to the old mode of proving the pre-requisites by evidence *aliunde* the deed. To this there are two answers: 1. The ninth section of the law of 1829, supplemental to the Act of 1827, and which provided that "the deed from the Auditor of Public Accounts shall be evidence of the regularity and legality of the sale, until the contrary shall be made appear," was not repealed by the revenue Act of 1833. It was repealed neither in express terms nor by necessary implication. On the contrary, it was by the revising law directed to be published, and was published in the Revised Code of 1833 as a part of the revenue system. Revised Code of 1833, 525, 434, No. 148. It was not repealed till the session of 1838–9 and then only as to cases coming within the purview of the revenue law of that year. It was hence in full force in November, 1833, when the deed in this case was executed, and that ground, for denying it the statutory effect in evidence, is taken away.

2. The argument assumes that the effect of the deed as evidence belongs exclusively to the law of the remedy. This

we have seen can make no difference, if the obligation of a contract, or the value of a right vested under a contract is thereby substantially impaired. But waiving this, we deny the assumption on which the argument is based. By the law which is the basis and the evidence of the contract between the State and the purchaser, the latter is entitled to a deed having a double effect, one as vesting title, and the other as *prima facie* evidence of its validity. The purchaser contracts for the one effect of the deed as well as for the other. If the effect of the deed as vesting title is a material part of the contract, the numerous trials in our Courts irresistibly prove that its effect, as evidence of the pre-requisite, is equally material; and any principle which will authorize the State to refuse performance of this stipulation, will justify it in repudiating the contract altogether. In no just sense can it be said that this effect of the deed as evidence is mere remedy, even as the latter, and the power of the legislature over it is understood by the opposite counsel. In their view, and in this we agree with them, the mere remedy is an incident to a contract and only an incident. The contract being once made, the law of the remedy attaches itself to the contract simply as a mode; it forms no portion of it; ( 3 Story on Const. § 1379;) and it is for the reason that the remedy forms no part of the contract, that they insist upon the absolute power of the legislature over it, uncontrolled by the Constitution. But here the effect of the deed as evidence is a part of an express contract. It is a proposition made by the legislature *in hæc verba*, and responded to and accepted by the purchaser. Upon the faith of the contract the purchaser bids at the sale, and pays his money into the State treasury. The Government has, year after year, for many years, enjoyed the benefit of the contract, and been provided for and sustained by these sales; and for the State now to repudiate the contract, or for the Courts to refuse to execute it for the benefit of the honest purchaser, in all its parts would cast an indelible stigma upon the public faith, and deservedly render the name of the State a by-word and a reproach.

But we are not left to rely on State honor, or upon the

mere sacredness of this vested right. It is a right secured to the purchaser by the Constitution, which protects the evidence of a contract as perfectly as it does the contract itself. 3 Story on Const. §§ 1379, 1393; *Garrett* v. *Wiggins*, 1 Scam. 335; *Fletcher* v. *Peck*, 2 Peters' Cond. R. 311, 319, 320; *Van Rensellaer* v. *Livingston*, 12 Wend. 491. Every party to a contract has a vested right in the evidence of it, independent of all constitutional provisions. It is on this principle that requiring particular evidence to sustain certain contracts, have never been so construed as to defeat contracts made before the passage of the statute, and proved according to the law as it existed at the time they were entered into. *Hilmore* v. *Shuter*, Bac. Ahr. *Statute*, letter C.; 12 Wend. 491; 7 Johns. 488; *Williams* v. *Pritchard*, 4 T. R. 2. The Massachusetts statute of 1805, chapter 30, after stating what should be evidence of an advancement to a child or grandchild, repeals all prior laws falling within its purview. It was held that a deed made prior to the repealing law and which by the existing law would have been evidence of an advancement, would have that effect as evidence notwithstanding the repeal of the law. *Whitman* v. *Hapgood*, 10 Mass. 437. So it is laid down in New York, that where a deed is acknowledged and recorded in pursuance of an existing law which declares the record evidence, the right to the record is a vested right; and a law declaring that it is not evidence would not only impair a vested right, but would impair and destroy the foundation of the contract between the parties who sell and purchase the land on the faith of the title as it appears of record. *Jackson* v. *How*, 19 Johns. 83; *Jackson* v. *Eaton*, 20 do. 480.

VII. It is further insisted, that the action is barred by the limitation law of 1835, which was passed on the 19th of January, and limited to take effect on the first day of June of that year. This suit was commenced within seven years after the Act went into operation, and cannot be barred without so construing the Act as to give it a retrospective operation; an effect which cannot be given to it, as this Court has already decided. *Rhineheart* v. *Schuyler*, 2 Gilm. 528.

This construction of our statute is sustained by all the authorities, that, in the construction of statutes, no statute is to have a retrospect beyond the time of its commencement. Bac. Abr. *Statute*, Letter C.; *Sayre* v. *Wisner*, 8 Wend. 661; *Ward* v. *Kittz*, 12 do. 137; *The People* v. *The Supervisors of Columbia Co.*, 10 do. 363; *Dash* v. *VanKleeck*, 7 Johns. 495, 503.

While this is admitted to be the general rule, the present is claimed as an exception. It is said that as the defendant took possession of the land between the passage of the law and the time fixed for its going into operation, the law may commence acting on the possession, as soon as passed or as soon as the possession was taken after its passage. But this precise point, and upon the same state of facts, was also decided in the above case of *Rhineheart* v. *Schuyler*, that the time was to be computed from the time the law went into operation. This was also the point ruled in the case of *The People* v. *The Supervisors of Columbia Co.*, as to the construction of the Revised Statutes of New York, which were passed at one time, to take effect at a future period. "The Revised Statutes," say the Court, "apply the limitation to actions or causes of action accruing or existing subsequent to their taking effect. They apply to existing demands, as if they had accrued at the time when the statute commenced its operation." The same point has been frequently decided to the same effect. Thus, a statute passed the 24th February, 1818, and limited to take effect from and after the 1st day of June, 1818, is to be considered as if it had been enacted on the last day, and went into immediate operation. *Medford* v. *Learned*, 16 Mass. 215; *Paddon* v. *Bartlett*, 3 English Common Law R. 252; *Weatherford* v. *Weatherford*, 8 Porter, 171. A statute passed in February, 1819, to take effect on the 1st of July, then next, and absolutely repealing a former Act by words *in presenti*, was not considered as repealing the former Act till the time limited by the latter, to go into operation. *Spaulding* v. *Alford*, 1 Pick. 35; *Commonwealth* v. *Kimball*, 21 do. 375; *Pennington* v. *Cox*, 1 Peter's Cond. R. 346-7.

Bruce *v.* Schuyler *et al.*

*A. Williams*, for the appellant.

The lands claimed in these several suits are in the Military Bounty Land District, and were granted by the Congress of the United States, for military bounties to the regular soldiers in the late war between the United States and Great Britain. In 1818, when the people of the Illinois Territory applied for admission into the Union as a State, Congress, in furtherance of the liberal policy which dictated these grants, required as a condition of the admission, that these lands, belonging, as they did, to non-residents, should not be taxed at all for three years, and that, after that time they should be taxed no higher than lands belonging to the inhabitants of the State. These conditions were agreed to by the Convention which formed the Constitution. The Constitution itself, provided, that property should be taxed by valuation, so that every person should pay a tax in proportion to the value of his property. These provisions were intended to protect non-resident land proprietors against the abuse of irresponsible power, by requiring that the inhabitants of the State should be subjected to the same exactions that might be imposed upon such non-residents, and also to protect particular classes of persons and species of property from unequal taxation, and they are amply sufficient for these purposes if observed in good faith. Their obvious import is, that all property should be subjected alike to the same common burdens, and should be construed to mean that for State revenue, all the property in the State should be taxed according to its value, and that for county, town, or city revenue, all the property in the same county, town or city, should be taxed in like manner. 5 Dana, 31; 9 do. 516.

Chancellor Kent, in his Commentaries, Vol. 2, p. 330, says: "Every person is entitled to be protected in the enjoyment of his property, not only from invasions of it by individuals, but from all unequal and undue assessments on the part of Government. It is not sufficient that no tax or imposition can be imposed upon the citizens, but by their representatives in the legislature. The citizens are entitled to require that the legislature itself shall cause all public taxation to be

fair and equal, in proportion to the value of property, so that no one class of individuals, and no one species of property may be unequally or unduly assessed."

Speaking of the oppressions practiced in New York by the assessment of taxes upon the waste and unproductive lands of non-residents, he says: "The unreclaimed lands, which the owner finds it impossible to cultivate, or even to sell, without great sacrifice, and which produce no revenue, are assessed, not only for such charges as may be deemed directly beneficial to the land, such as making and repairing roads and bridges, but for all the wants and purposes of the inhabitants. The lands are made auxiliary to the maintenance of the poor, and the destruction of wild animals; and the inhabitants of each town have been left to judge, in their discretion, of the extent of their wants. Such a power vested in the inhabitants of each town, of raising money for their own use, on the property of others, has produced, in many instances, very great abuses and injustice. It has corrupted the morals of the people, and lead to the plunder of the property of non-resident land holders," * * *. "The Ordinance of Congress, of July 13th, 1787, passed for the Government of the North-Western Territory, anticipated this propensity to abuse of power, and undertook to guard against it, by the provision, that in no case should any legislature within that Territory, tax the lands of non-resident proprietors, higher than those of residents. There is a similar provision in the Constitution of Missouri, and one still broader in that of the State of Illinois."

Thus restricted in 1823, the legislature commenced a system of taxation, which was continued with slight modifications until 1839;* whereby the whole amount of the State taxes was imposed upon these non-resident lands, and the inhabitants of the State were exempt from paying any part of the State revenue. At this time and for many years after, these lands were situated far beyond the limits of any organized county, in the exclusive occupancy of "the aboriginies, who claimed and exercised the native right of roaming *ad libitum* over the wide spread prairies of this fertile, and now

highly cultivated portion of the State." 2 Gilm. 512. Thus, a legislature chosen by the inhabitants of the State, accountable only to them, legislating for their exclusive benefit, determine how much State revenue shall be raised, and to what purposes it shall be appropriated, and then require these non-residents to pay the whole of it. This as a refinement upon the principle of division. of labor, the benefit to the inhabitants of the State, and the burden to the non-residents. Governors, Legislatures, Judges, Auditors, Treasurers, and supernumeraries, made, applied, expounded and executed laws for the benefit of the people of the State, fixed their compensation, and then required it to be paid exclusively by these non-residents, because they owned these wild lands in the occupation of the "aborigines." The only law passed during this period, having the semblance of benefit to non-residents, was an Act to prevent trespasses by cutting timber, and they were expressly excluded from all participation in its advantages. It was further provided, that if these non-residents failed to pay these very reasonable exactions, the Auditor should advertise, sell and convey their lands, and that the deed so made, should vest in the purchaser, a good and perfect title, and by an Act passed in 1829, it was enacted that such deed should be evidence of the regularity and legality of the sale.

Under the operation of this system of legislation, nearly every acre of these non-resident lands, amounting in value according to legislative valuation, to eight millions of dollars, was confiscated whilst they were yet in the occupancy of the "aborigines."

This Court has decided that all the Acts included in this system are constitutional, and that the Act of 1829 establishes a new rule of evidence, in contravention of the Common Law rule, and makes the Auditor's deed per se evidence of title. They have not, however, decided that the change was a wise one, and ought to continue any longer than it should please the legislature to continue it; on the contrary, they have frequently recognized and approved the Common Law rule. In Hill v. Leonard, 4 Scam. 142, they

say it is "founded on reason and authority." They recognize the power of the legislature to establish this new rule, and their duty to enforce it whilst it existed, but the Act of 1829, which established this rule, is now repealed, and the question is, whether the rule established by it, continues to be obligatory upon the Court. It is contended on the other side, that it does, and the Court is asked to be on the "alert," to find reasons for continuing this new rule. ` They contend that our title has been divested, and the only evidence which they offer in support of this pretension, is an Auditor's deed purporting to convey the lands for one two hundredth part of their value. If the old rules of evidence sanctioned by reason and authority, are to prevail, this evidence is not sufficient. It is a rule of universal application, that penal statutes, statutes in derogation of the Common Law, and statutes authorising summary proceedings, whereby a person may be deprived of his property, should be construed strictly and should never be extended by construction or implication, beyond the case actually provided for. *Fairfax's devisee v. Hunter's lessee*, 2 Peter's Cond. R. 630–1; *Young* v. *The Commonwealth*, 4 Bin. 116; *Stewart* v. *Hamilton*, 2 Hen. & Munf. 545; *Kinney* v. *Beverly*, Ib. 342–3; *Asbury* v. *Calloway*, 1 Wash. 74; *Mayor of Alexandria* v. *Chapman*, 4 Hen. & Munf. 276; *Raplee* v. *Morgan*, 2 Scam, 563; Ex parte *Robert B. Randolph*, 2 Brock. 457; *Murphy's Adm'r.* v. *The Bank*, 5 Alabama, 422; *Adm'r. of Alexander* v. *The Bank*, Ib. 465; *Sharp* v. *Speir*, 4 Hill, 84; *Myers* v. *Foster*, 6 Cowen, 569; *Melody* v. *Read*, 4 Mass. 473; *The United States* v. *Wiltberger*, 4 Peter's Cond. R. 596; *Smith* v. *Sproaner*, 3 Pick. 230; *Vanvalkenberg* v. *Torry*, 7 Cowen, 255.

And it is incumbent upon the person claiming title ·under such statutes, to show that they have been strictly pursued; he must prove that every requirement, having the semblance of benefit to the person whose title is to be divested by such statutes, has been strictly pursued. `Atkins* v. *Kinman*, 20 Wend. 249; *Bloom* v. *Burdick*, 1 Hill, 130, 141–2; *Waldron* v. *McCown*, Ib. 114; *Caskey* v. *The State*, 6 Alabama, 194;

*Jackson* v. *Esty,* 7 Wend. 148; *Martin* v. *Avery,* 8 Alabama, 430; *Curry* v. *The Bank, &c.* 8 Porter, 372; *Allums* v. *Hawley,* Ib. 585; *Monk* v. *Jenkins,* 2 Hill's Ch. R. 12; *Gilbert* v. *The Turnpike Company,* 3 Johns Cases, 108; *Andover & Medford Turnpike, &c.* v. *Gould,* 6 Mass. 44; *Levy Court* v.——, 4 Har. & Johns. 231; *Williams* v. *Peyton's lessee,* 4 Peters' Cond. R. 395; *Thatcher* v. *Powell,* 5 do. 32; *Gaines* v. *Stiles,* 14 Peters, 328; 2 Ohio R. 333; *Smith* v. *Hileman,* 1 Scam. 325; *Day* v. *Eaton,* Ib. 476; *Fitch* v. *Pinckard,* 3 do. 78; *Hill* v. *Leonard,* Ib. 142; *Rex* v. *Croke,* 1 Cowper, 26; *Davidson* v. *Gill,* 1 East, 64; *Blossom* v. *Camron,* 14 Mass. 177; *Libby* v. *Burkham,* 15 do. 147–8.

But this Court has, (erroneously as it is conceived,) decided that all this is overturned by the new rule of evidence, established by the revision Act of 1829, and the question now recurs, whether that new rule of evidence continues in force after the Act upon which alone it depends is repealed. The rule of evidence depends upon the law in force at the time the evidence is offered in Court, and every question respecting its admission must be determined by the law then in force. The Act of 1829 being now undeniably repealed, it is difficult to conceive upon what principle it can be looked to in deciding the present question. The legislature had as much power to abolish that new rule of evidence as it had to change the old common law rule by its establishment, unless it was protected from change by the purchase of the land at the tax sale, and this can hardly be seriously contended for. The right acquired by that contract, and which is protected by the Constitution, was to hold the land, provided the sale was made in conformity with the law; but the purchaser acquires no vested right in the rule of evidence by which the fact that the land was sold in conformity with the law was to be shown. See Rev. Stat. 455, § 2; Ibid 463, 437, §§ 38, 39, 40; Ibid 78, § 4; Ibid 232–3, §§ 3, 4, 9; Ibid 337, § 1; *Garrett* v. *Wiggins,* 1 Scam. 338; 3 Story on Const. §§ 1375, 1377, 1378, 1379, 1385, 1393; *Sturgis* v. *Crowninshield,* 4 Peters' Cond. R. 421; *Saterlee* v. *Mathewson,* 2 Peters, 280; *Jackson* v. *Lamphire,* 3 do. 280; *Watson* v. *Mercer,* 8 do. 108; *Lewis* v. *Foster,* 1 New Hamp. 61.

The Act which authorized the Auditor to make tax deeds was repealed without any saving clause, before the deeds in these cases were executed by him. See Acts 1827, 328, §§ 4, 28; Acts 1833, 534, § 18. The legislature had power to make this repeal, and its effect is to take all power and jurisdiction from the Auditor. It acted upon his authority and not upon the right acquired by the purchaser at the sale, and consequently these deeds are void for want of authority in the Auditor to make them.

In *Rex* v. *The Justices*, &c. 3 Burr. 1456, Miller, an imprisoned insolvent, had been compelled to assign his property, and had done every thing necessary to entitle him to his discharge as early as September 26, 1761, and then urged his discharge, but the Court of Quarter Sessions adjourned from time to time till after the 19th of November 1761, at which time the bankrupt Act, under which the proceedings were had, was repealed. Lord Mansfield, delivering the opinion of the Court, held that no jurisdiction remained in the Court of Quarter Sessions after the repeal of the Act, and that they could not consequently grant the certificate of discharge.

In *The Bank of Hamilton* v. *Dudley's lessee*, 2 Peters, 520, proceedings in the Court of Common Pleas in the State of Ohio, by an administrator to obtain an order to sell real estate for the payment of debts, at the May term 1804, an order was made for that purpose, but the order being defectively entered by the clerk, the Court, at the August term of 1805, (the Act under which the proceedings were had, having been repealed between the times of the first and second entries,) made an order *nunc pro tunc* directing the sale of the lands. It was held by the Supreme Courts of Ohio and of the United States, that this second order was *coram non judice*, and that the sale made under it was absolutely void.

In *Springfield* v. *The Hampden Commissioners*, &c. 6 Pick. 501. The inhabitants of Springfield applied to the Com'rs of Highways, by petition to finish a highway which had been duly laid out through that town, and to certify the expenses thereof to the Court of Sessions, in order that the same might be paid, according to the provisions of an Act of Assembly of 1825, out of the county treasury. The commissioners refused

Bruce *v.* Schuyler *et al.*

to proceed as proposed by said petition, and the inhabitants then applied to the Supreme Court for a mandamus against the commissioners to compel them to proceed, and at the September term of 1826 an alternative mandamus was awarded. At the next succeeding term, the commissioners answered, showing cause, &c. At the September term, 1827, the case was partially heard, and continued *nisi* by consent, for argument in writing. So it remained until the March term, 1828, previous to which time, and since the continuance *nisi*, the Act under which the commissioners acted had been repealed. It was held, that no power or authority remained with the commissioners in relation to the subject matter of these proceedings; and the Court lay down this general rule, that where a special tribunal is created by statute, upon the repeal of the statute without any saving clause of proceedings commenced and pending before it, its whole power and authority cease, and that it cannot proceed to finish proceedings so commenced, and that this principle is applicable to special jurisdiction conferred on Courts of general jurisdiction. It is also held, that there is no such thing as a vested right in a particular remedy.

In all these cases the repeal acted upon the power and jurisdiction of the tribunal, and they fully sustain the general principle asserted in the first, that no proceedings can be pursued under a repealed statute, though commenced before the repeal, and this too, in civil cases where individuals have acquired rights under the proceedings so commenced.

Some of the following cases go further, and much further, than is necessary to make out the defence in this case. They not only destroy the jurisdiction of the tribunal, but seem to impair rights secured by contract. In *Thayer* v. *Seavey*, 2 Fairf. 284, certain persons were on the 20th day of November, 1829, arrested on an execution, for a debt due to the plaintiff. On the 21st day of the same month, prior to the 21st day of January, 1834, an action of debt was commenced by the plaintiff against the keeper of the jail, for permitting the escape. Under the laws in force at the time of the escape, and of the commencement of the suit, the plaintiff was entitled to recover of

the keeper in an action of debt the whole amount of his execution. On the 21st day of January, 1834, the legislature of Maine passed an Act providing that no action should thereafter be maintained to recover damages for an escape of any debtor committed on execution, except a special action on the case. *Held*, that this Act was constitutional and constituted a complete bar to the further prosecution of the suit. And the principle is broadly asserted that the legislature may modify remedies at pleasure, and that in cases of repeal, it is not a question of intention but of dry law.

In *Potter* v. *Sturtevant's* adm'r, 4 Greenl. 154, Drinkwater gave bond as administrator of Prince. Suit was brought on this bond for the benefit of the children of Prince, against Drinkwater, adm'r. At the time this bond was given, the law then in force authorized a recovery of the whole amount of the penalty in case of default in an action of debt; but in 1821, before suit was commenced, all laws on the subject were repealed. The repealing Act had a saving clause, in these · words: "Saving also to all persons, all rights of action in virtue of any of the Acts hereby repealed; and all actions and causes of action, commended in virtue of, or founded on said Acts, or any of them, in the same manner as though this Act or any Acts revising and virtually repealing said former Acts had never been passed." *Held*, that this case was not within the last member of the proviso, and that the first member only saved the right of action, but did not hinder the legislature from reducing the amount of the recovery, or otherwise modifying the remedy.

In the *Oriental Bank* v. *Freese*, 18 Maine, (6 Shepley,) 109, S. W. & J. Freese being arrested under an execution in favor of the plaintiff, for $86·95 debt, and $8·70 costs, gave a bond for the prison limits to the plaintiff, with R. W. Freese as security, dated 18th June, 1838. Suit was brought on said bond. At the date of the bond the plaintiff was entitled, in case of default, under the laws then in force to recover the full amount of the execution. In 1839 the Legislature passed an Act providing that, in such cases, no more should be recovered than the damages actually sustained. *Held*, that

Bruce *v.* Schuyler *et al.*

the Act applied to and governed this case; that it was constitutional, and that it did not deprive the plaintiff of any vested right; that it, in effect, provides that a different description of evidence shall be received, &c. It also recites and approves the following passage from the opinion of Chief Justice Marshall, in the case of *Ogden* v. *Saunders:* "In prescribing the evidence which shall be received in its Courts and the effect of that evidence, the State exercises its acknowledged powers. It is likewise in the exercise of its legitimate powers, when it is regulating the remedy and mode of proceeding in its Courts."

In *The People* v. *Livingston.* 6 Wend. 526, certain lands were sold on the 26th day of August, 1829, under execution. At the time of the sale the plaintiff in this case, as a judgment creditor of the defendant, had a right to redeem the land sold, within fifteen months from the sale. The Act authorizing the redemption was repealed December 31, 1829. The repealing Act made new and different provisions as to the manner of redeeming, requiring proof not required by the repealed Act. The repealing Act had this proviso: "The repeal of any statutory provision by this Act shall not affect any act done, or right accrued or established, or any proceeding, suit, or prosecution, had or commenced in any civil case previous to the time when such repeal shall take effect; but every such act, right and proceeding, shall remain as valid and effectual as if the provision so repealed had remained in force." The plaintiff applied to redeem within the fifteen months, and did all required by the repeal Act; but as application was made after the repeal, *held*, that he had no right to redeem under its provisions, but that he must, as to proof &c. conform to the requirements of the new Act; *Held*, also, that the effect of the proviso was, that every suit, right, &c. remained in force notwithstanding the repeal of the Act which supported them; but their future proceedings must be governed by the new statute.

In *Coles* v. *The County of Madison*, Bre. 115, Coles being subject to a penalty under a statute of 1819, an action of debt was brought for its recovery. The case was tried Septem-

ber, 1824, and verdict against the defendant for the penalty. A motion was made for a new trial, and continued under advisement till September, 1825. In January, 1825, the legislature passed an Act releasing all penalties incurred under the Act of 1819. *Held,* that the Act was constitutional, and prevented the Court from entering judgment upon the verdict. See, also, 2 Peters' Cond. R. and note at the end of the case.

*Pope* v. *Lewis,* 4 Ala. 487, was a *qui tam,* when brought, to recover a penalty to which the defendant was subjected under a statute then in force. Before the trial the statute was repealed; *Held,* that no judgment could be given under the statute after its repeal. The effect of an absolute repeal is to put an end to the Act there repealed, as to all penalties and forfeitures created by it and not ascertained by judgment, as completely as if it had never existed.

*Saterlee* v. *Mathewson,* 2 Peters, 380, was an action of ejectment, in which the plaintiff recovered, on the ground that the defendant was his tenant. Upon writ of error from the judgment, the Supreme Court of Pennsylvania held that the facts in the case did not constitute the relation of landlord and tenant, reversed the judgment and awarded a *venire de novo.* Before it came on again for trial, the legislature passed an Act declaring that such facts should constitute said relation: *Held,* that the Act was constitutional and governed this case.

In *Jackson* v. *Lamphire,* 3 Peters, 280: "It is within the undoubted power of State legislatures to pass recording Acts, by which the elder grantor shall be postponed to a younger, if the prior deed is not recorded within the limited time; and the power is the same whether the deed is dated before or after the passage of the recording Act." "Cases may occur where the provisions of a law on those subjects may be so unreasonable as to amount to a denial of a right, and call for the interposition of a Court. See, also, *Green* v. *Biddle,* 5 Peters' Cond. R.; *Varick* v. *Briggs,* 6 Paige; *Buller* v. *Palmer,* 1 Hill.

In *Watson* v. *Mercer,* 8 Peters, 108. Husband and wife

Bruce *v.* Schuyler *et al.*

conveyed certain lands in Pennsylvania belonging to the wife. The deed was not so acknowledged as to give it effect under the laws of that State. After the death of the wife, her heirs recovered the lands in an action of ejectment against the grantee. The legislature then passed an Act to cure all defective acknowledgments of the kind, and declaring that they should have the same efficacy as if they had been originally in proper form. In an action brought after the passage of this Act for the same land, by the grantee against the heirs, it was held that the Act was constitutional and rendered the deed valid, and that the grantee was entitled to recover.

In *Lewis* v. *Foster,* 1 New Hamp. judgment was recovered for a penalty under an Act of 1796. After judgment this Act was repealed. Upon review of the case, held, that the repeal took away the plaintiff's right of action.

In *Butler* v. *Palmer,* 1 Hill, certain lands were sold by the Master in Chancery. At the time of sale, Morehouse had a right to redeem the land within fifteen months, under an Act of the legislature. The Act was afterwards, within the fifteen months, repealed. After the repeal, but before the expiration of the fifteen months, Morehouse applied to redeem, and did every thing required by the Act in force at the time of sale: *Held,* that the repealing Act was constitutional, and that it took away the right of redemption. It was laid down as a general rule, that when a statute is repealed, it must be considered the same as if it had never existed; except with reference to such parts as are saved by the repealing statute.

But for the inclination there is to sustain every pretence of claim under a tax title, I should consider it a work of supererogation to cite authorities upon a point so clear upon principle. It is a principle of universal law, applicable to every species of agency, whether created by statute or by individuals, that the principal may at any time revoke the authority of the agent, and that after an unconditional revocation the agent has no authority to do a single act for the principal, not even in completing transactions commenced by him whilst his authority existed. What he did in pursuance of his authority, whilst it continued, is binding upon his prin-

cipal, and he, and not his agent, is bound to consummate all inchoate rights acquired by any person through the acts of the agent. A contrary doctrine, whether applicable to officers or private attorneys, would be monstrous in its consequences.

*O. H. Browning,* for the appellees.

I propose to examine a single question. Was that part of the fourth section of the law of 1827, which entitled purchasers of lands at tax sales to receive deeds from the Auditor, repealed by the law of 1833?

The revenue law of 1827 conferred upon the Auditor of Public Accounts power and authority, to make deeds to the purchasers of lands at tax sales, and prescribed the form of the deed.

Has that power been taken away, or does it still exist, and may it yet be exercised by the Auditor in cases where lands were lawfully sold by him for taxes, and deeds not yet executed by him to the purchaser?

The solution of this question depends upon the construction which the Court may give to the revenue law of 1833.

It is contended on the one hand, that the Act of 1833 stript the Auditor of the power, which he before possessed to make deeds to purchasers, and that all deeds executed by him since that time, are null and void.

On the other hand it is insisted, that the Act of 1833 was not intended to, and has not in fact, at all affected the authority of the Auditor to execute deeds for lands before that time sold by him for taxes, but that he now has the same right by law, to make deeds to such purchasers that he had before the passage of the Act of 1833.

I. In the construction of one part of the statute, every other part ought to be taken into consideration. 6 Bac. Abr. 380. And if there be two affirmative statutes upon the same subject, the one does not repeal the other, if both may consist together, and we ought to seek for such a construction as will reconcile them together. *Warder* v. *Arrell,* 2 Wash. Va. R. 296.

The provisions of any statute ought to receive such reasonable construction, if the words and subject matter will admit of it, as that the existing rights of the public, or of individuals be not infringed. 6 Bac. Abr. 391. And if the literal expressions of the law would lead to absurd, unjust, or inconvenient consequences, such a construction should be given as to avoid such consequences, if, from the whole purview of the law, and giving effect to the words used, it may fairly be done. 6 Bac. Abr. 380, 382.

.Apply these principles to the case under consideration. The laws of 1827 and 1833 are both affirmative statutes upon the same subject, and, so far as we insist they are still in force, perfectly consistent with each other; and may both, so far as contended for, have full effect and operation given to them without any sort of incongruity or conflict.

At the time of the passage of the Act of 1833, there were hundreds of individuals who had existing rights, under the law of 1827, to receive from the Auditor, deeds for lands before that time purchased by them at the tax sales. The construction for which we contend, preserves these rights unimpaired, and enforces them, without in the slightest degree interfering with, or impeding the full, perfect and entire operation of the law of 1833; whilst the opposite construction not only infringes, but absolutely extinguishes and destroys them.

After purchases have been made, and money paid under the existing laws of the State, with the guaranty which those laws gave, that deeds should be executed as evidence of such purchases, would it not be both absurd and unjust to adopt such a construction of the law as would enable the State to retain the money, whilst at the same time she wrested from the purchaser the benefit of his purchase? And would it not be as unjust to the character and good faith of the State, as to the injured citizen? Yet it is insisted that such a construction must be made; and this without any known, or assignable reason on the part of the legislature, for the enactment of such law, other than the mere wantonness of power.

If, from a view of the whole law, or from other cases in

*pari materia,* the evident intention is different from the literal import of the terms employed to express it in a particular part of the law, that intention should prevail, for that, in fact, is the will of the legislature. 6 Bac. Abr. 380. Whenever the intention of the makers of a statute can be discovered, it ought to be followed with reason and discretion in the construction of the statute, although such construction seem contrary to the letter of the statute. 6 Bac. Abr. 384. And that a law is the best expositor of itself; that every part of an Act is to be taken into view for the purpose of discovering the mind of the legislature; and that the details of one part may contain regulations restricting the extent of general expressions used in another part of the same Act; are among those plain rules laid down by common sense for the exposition of statutes, which have been uniformly acknowledged. *Pennington* v. *Coxe,* 1 Peters' Cond. R. 346.

Now, let this law of 1833 become its own expositor. What was the object of the law, and what the purpose and intention of the legislature in its enactment? Before 1833, the lands of non-resident delinquent tax payers were advertised by the Auditor, and sold by the Auditor at the Seat of Government, and the only object of this law was, to transfer the sales from the Seat of Government, to the county seats of the counties where the land lay, and to substitute the county clerks for the Auditor in making the sales. To accomplish this, some new provisions of law were necessary, and some parts of the existing law were to be repealed; and after the power to make sales had been transferred to the clerks, and all proper provision made for their guidance, four sections of the old law were repealed. What were these sections, and why were they repealed?

The third section, which is the first in order of those repealed, required the Auditor to make out from his books the non-resident delinquent land list, and advertise the same for sale. This duty was devolved upon the county clerks of the several counties by the law of 1833, and the third section of the law of 1827, being inconsistent with it, was therefore repealed.

The fourth section required the Auditor, on the first Mon-

day in January, to proceed to sell, at the State House at the Seat of Government, the lands so advertised. This section also contained the form of the deed to be given by the Auditor to purchasers. By the law of 1833, the sales were required to be made by the county clerks, assisted by the sheriffs, and so much of the fourth section of the law of 1827 as required the same duty to be performed by the Auditor, was within the purview of the new law, and, therefore, it was repealed, so far as related to the sales, but I trust to show no farther.

The fifth section contained the provisions for redeeming lands which had been sold. A new mode of redemption was provided, and, therefore, it was repealed.

The twenty seventh section related to lands struck off to the State, and directed the disposition to be made of them. By the provisions of the new law, new regulations were introduced upon this subject, and, therefore, the twenty seventh section was repealed. But in all this, nothing can be found indicating an intention on the part of the legislature to take from the Auditor the power to make deeds for lands which had, before that time, been sold by him in conformity with existing laws.

The language of the repealing clause is: "The third, fourth, fifth, and twenty seventh sections, and all other Acts, and parts of Acts, within the purview of this Act, shall be, and are hereby repealed." And we contend that the manifest intention, and only intention of the legislature was, to repeal so much, and no more, of the enumerated sections, and of all other parts of the law, as came within the purview of the new Act. The reasons for the repeal of these sections have already been exhibited, but none of those reasons apply to the form of the deed, or to the power of the Auditor to execute deeds for past sales; for neither the one, nor the other was in conflict with the new law, nor within the purview of any of its provisions.

The provision of an Act repealing all Acts, or parts of Acts, coming within its purview, should be understood as repealing all Acts in relation to all cases which are provided

for by the repealing Act; and that the provisions of no Act are thereby repealed in relation to cases not provided for by it. *Payne* v. *Conner & Adams*, 3 Bibb, 181. And the literal interpretation of an Act is not, certainly, in all cases, the interpretation which either reason or law requires to be given to it; for it is not the words of an Act, but the will of the legislature, which constitutes the law; and although words are the most common, they are not the only signs of the legislative will. The context, the subject matter, the effects and consequences, and the reason and spirit of the law, are often called in to aid in ascertaining the intention of the legislature. No language is indeed so perfect, as to afford words to express every idea, upon all subjects, with perspicuity and precision; and even when words are not wanting, those that are most happily adapted to the purpose in view, do not always occur to the mind of the legislature. Hence it is, that words are employed which sometimes go beyond the legislative will, and sometimes fall short of it. *Mason* v. *Rogers*, 4 Litt. 377.

We have endeavored to show that the subject matter, the effects and consequences, and the spirit and reason of the law, are all in favor of upholding the power of the Auditor to execute deeds for lands sold by him anterior to the passage of the Act of 1833, and we are fortified in this position by the examination of one other section of the law, in addition to those which have already been commented upon.

When the sales had been transferred from the Seat of Government to the county seats, and when the clerks had been substituted as the officers to make the sales, instead of the Auditor, it became necessary to clothe them with power to execute deeds to purchasers.

This is done by the sixth section, which provides, among other things, that the clerks shall execute deeds of conveyance to all persons who become purchasers of land, at the sales made by them, "which deed shall be as near as practicable, after the form, as is now required to be given by the Auditor in similar cases;" showing as clearly as language can show it, that at the very moment of passing the Act of 1833, they

recognized the power of the Auditor, as existing in full force, and unimpaired by that Act, to execute deeds under, and in conformity with the law of 1827.

II. But we wish to place this question upon another ground, which we conceive to be invulnerable—the cotemporaneous construction of the Act, the long acquiescence of the entire community in that construction, and the uniform practice of the government under it.

A long established construction of a statute, by the officers to whom its execution is entrusted, ought to have the force of a judicial determination. Such, has always been the deference paid by Courts to such an exposition of statute or constitutional law. *Boyden* v. *Brookline,* 8 Verm. 286; *Schoff* v. *Bloomfield,* Ib. 478.

A contemporaneous is generally the best construction of a statute. It gives the sense of a community, of the terms made use of by a legislature. If there is ambiguity in the language, the understanding and application of it, when the statute first comes into operation, sanctioned by long acquiescence on the part of the legislature, and judicial tribunals is the strongest evidence that it has been rightly explained in practice. A construction under such circumstances becomes established law. *Packard* v. *Richardson,* 17 Mass. 143; *Rogers* v. *Goodwin,* 2 do. 477.

In the case of *Stuart* v. *Laird,* 1 Cond. 317, a question arose as to the right and power of the Judges of the Supreme Court, to discharge the duties of Circuit Judges. In disposing of the case, the Court say: "To this objection, which is of recent date, it is sufficient to observe, that practice and acquiescence under it for a period of several years, afford an irresistible answer, and have indeed, fixed the construction. It is a contemporary interpretation of the most forcible nature. This practical exposition, is too strong and obstinate, to be shaken or controlled."

In Ohio a question arose, as to whether a deed was properly authenticated, and whether the certificate of authentication was in conformity to the provisions of the law existing at the date of the authentication. The Court say: "It is

now too late to require a strict adherence to the law. A different practice has prevailed since the first establishment of the Territorial Government, which cannot be corrected without incaulable mischief, and if it had been the opinion of the Court, when they were considering and deciding this case, that the words of the statute ought to be literally copied, and that such should have been the course from the beginning, they would have resorted the maxim *communis error facit jus*, rather than encounter the consequences of shaking the title to an indefinite portion of the State. No law can require the correction of an error in its construction, which has long existed, and has been generally acquiesced in. Lord Coke says, not even *magna charta*. *Brown* v. *Farran*, 3 Ham. 157.

Fourteen years, wanting a few weeks, have now elapsed since the passage of the Act of 1833, which contains the repealing clause. Throughout all this period, the Auditor has continued to execute deeds, in conformity with the law of 1827, to purchasers under that law; and the entire community, without once questioning his power, has acquiesced in his acts. The legislatures, year after year, have been silent spectators of his exercise of this authority, without interposing an objection. Time and again, these deeds have been before the Circuit Courts, and from thence to the Court of last resort, and adjudicated upon in cases involving immense estate, with lawyers of distinguished ability, and of fixed, unwavering, unconquerable hostility to tax titles, combatting their validity, and in all this time, with every possible incentive to a severe scrutiny of the law, it has never once been urged that the Auditor, in issuing those deeds, had transcended his authority, or that the law under which he acted, no longer had an existence. The objection is now brought forward for the first time. We ask, then, after this long and continual exercise of the power by the officer whose duty it was to execute the law; and after an acquiescence in his acts by every department of the Government, by the entire community, by the bench and the bar, for the period of fourteen years, without a doubt as to the existence of the pow-

er ever having been suggested, whether we are not entitled to demand that this contemporaneous construction, thus sanctioned, shall have the force of a judicial determination, and whether the question shall not be considered as no longer open to discussion.

The Opinion of the Court was delivered by

WILSON, C. J.* This was an action of *ejectment*, and upon the trial of the case in the Court below, the counsel made an agreement by which two questions were made for the decision of the Court, the adjudication upon which was to settle the case.

The first question was as to the legality and sufficiency of the deed offered in evidence, and relied upon by the plaintiff to prove title in him to the land sued for. This was an Auditor's deed of land sold by him for taxes, under the revenue laws of 1827 and 1829. The sale in this case was made before, but the deed was not executed until after the revenue law of 1833 was passed and took effect.

The second question for the decision of the Court was, whether the possession of the land in controversy and payment of taxes as required by law by the defendant, for seven years previous to the commencement of this action, constituted a bar to the title of the plaintiff. The defendant's possession commenced seven years before this action was instituted, but the limitation law had not been in operation seven years prior to that period.

Upon this agreement the Court decided that the Auditor's deed was evidence of title in the plaintiff; and second, that his title was not barred by the Statute of Limitations. To these decisions the defendant, by his counsel, excepted, and assigns for error, *first*, that the Court erred in rendering judgment for the plaintiff; and *second*, that the Court

---

*The cases of *Bruce* v. *Schuyler*, *Bruen* v. *Graves*, and *Bean* v. *McNutt*, were argued together and decided at the December term 1846, but the Opinions were not filed until the present term. There was a vacancy upon the Bench at the time of the argument, occasioned by the resignation of the Hon. Walter B. Scates.

erred in deciding that the plaintiff's right of recovery was not barred by the Statute of Limitations.

The first position assumed by the counsel for the appellant in the argument of this case is, that the revenue law of 1827, under which the land in controversy was sold and conveyed by the Auditor, for the tax due thereon, was unconstitutional; *first,* because it infringes the twentieth section of the eighth article, the eighth section of the eighth article and the first section of the fourth article of the Constitution; and *second,* because it infringes the Ordinance.

This is, undoubtedly, a grave and important question, and had the revenue law been one of recent date, and were there no adjudications upon its constitutionality, we might pause in affirming the legality of all its provisions. But it does not present itself in this attitude. The length of time this law has been in operation, (for all the provisions objected to are nearly as old as the Constitution itself,) the cotemporaneous construction it received, and the acquiesence therein, and also the adjudications of this Court in accordance with that construction and acquiesence, and in confirmation of its constitutionality, must, we think, be regarded as having settled the constitutionality of the law, with reference to both the Constitution and the Ordinance.

That the Court cannot regard the question raised by the counsel in relation to the opposition of the revenue law to the Constitution or the Ordinance, as proper for re-adjudication upon its merits, will be manifest upon a slight notice of the character of the cotemporaneous and judicial construction which this law has received.

All the provisions of the revenue law that are complained of, and that can be regarded as at all of a questionable character, are coeval with the earliest legislation, under the Constitution, and their enactment was participated in by a number of the framers of that instrument. They continued in uninterrupted operation until the question of its constitutionality was brought before the Supreme Court in the case of *Rhinehart* v. *Schuyler*, in 1843, (2 Gilm. 473,) and by it sustained. Prior to this time, this law had received the un-

equivocal sanction of the legislature, by revisions and modifications of its details on numerous occasions, and that of the Courts, by adjudications upon questions growing out of its operation, and upon titles acquired under it. In short, it has been either directly sanctioned or acquiesced in by all the departments of Government, and by its officers, with the concurrence of the entire community, without a doubt or question, for about twenty years. Such a cotempo'raneous construction of a statute, or constitutional law, thus approved and sanctioned, has always been regarded by the Courts as equivalent to a positive law.

In the case of *Boyder* v. *Brooklin*, and *Goff* v. *Bloomfield*, the Court decided that a long established construction of a statute by the officers to whom its execution is entrusted, ought to have the force of a judicial determination. 8 Verm. 286, 478.

It has also been decided that a cotemporaneous is generally the best construction of a law. It gives the sense of a community of the terms made use of by the legislature. 17 Mass. 143; 2 do. 477. And after the Judges of the Supreme Court of the United States had held Circuit Courts for little more than half the period that this law has been acquiesced in, under a law of Congress, they unanimously, I believe, determined that it was too late to inquire into the constitutionality of the law; that practice and acquiesence under it for such a length of time had fixed its construction.

The present is a stronger case of cotemporaneous construction than any of these, and one fully justifying a resort to the maxim of *communis error facil jus.* But we are not under the necessity of relying upon general principles, or the analogy of adjudged cases, to sustain the constitutionality of the revenue law. It has received a judicial affirmation of the highest character of which it is capable. The case of *Rhinehart* v. *Schuyler* was brought before this Court for the purpose of settling this question. It was argued before the Court under its old organization, and again re-argued before it as at present organized, by eminent counsel, and with great ability, and after mature deliberation the Court, on both oc-

casions, affirmed the constitutionality of the law. We repeat, therefore, that the repeated ratification of the constitutionality of the law by the several departments of the Government; the long practice under it by its officers, with the acquiesence and approval of the entire community, followed up as it has been by a solemn adjudication of the Supreme Court, corresponding with the sense and approbation of the Government and people thus indicated, must be regarded as having definitely settled this question. From these considerations, we are disposed to adhere to the law as already settled, even though we might regard some of its provisions of a doubtful character, if recently enacted. But among the most valuable attributes of a written Constitution, are certainty and uniformity; without these, it can afford neither confidence nor security. It will change with the individual opinions of the Judges, as they may succeed each other on the bench. The prior decisions will furnish no guide for the future, and all will be uncertainty and doubt.

Much has been said here and elsewhere against the policy of the revenue law, particularly as to the manner of valuing, classing, and selling land liable to taxation. It may not be improper, therefore, to remark, that if any apology was necessary for the manner of assessing land, as prescribed by the law, it may be found in the situation of the country at the time it was adopted. A large portion of it was uninhabited, except by the aborigines, which precluded the possibility of valuation by actual entry upon and inspection of the land by individuals. A classification and a corresponding valuation of the land, therefore, was the only mode that could be adopted by the legislature to raise a revenue for the support of government. This system was uniform and bore alike upon residents and non-residents, and the same may be said with respect to every part of it. A summary method of proceeding for the purpose of collecting its revenue is a practice common to all governments, and is forced upon them by the natural principle of self preservation; for without revenue no government can continue to exist, and a resort to prompt and stringent means is generally found necessary to insure its

collection. The protection of the person and property of the citizen, and also the property of the non-resident, imposes upon each of them as high an obligation to contribute their pecuniary assessment for its support, as it does upon the citizen to defend it with his arms, and when this duty is not voluntarily performed it ought to be enforced by the law; and when a resort to a sale of land for the purpose of collecting the tax due thereon, is forced upon the government, it would seem to be the interest of the owner of the land, as well as the government, to inspire confidence in titles thus acquired, to make it sell for the best price. It is the want of confidence in these titles that contributes so largely to the sacrifice often incurred by individuals, as to have occasioned the remark in a spirit of condemnation, that on these occasions acres are sold for cents. This is doubtless often true, and will continue to be so, so long as there exists a want of confidence in titles to land sold for taxes. While, therefore, the Court should subject the acts of officers under this law to a severe scrutiny, they should not, because of the supposed hardship, seek for pretexts to set aside sales under it. It is doubtless the duty of the Government to adopt such a system as will be best calculated to give notice to the land owner when the tax thereon is due and must be paid, and after a sale for taxes the same policy should be adopted to notify him that the land has been sold, and also of the time within which it may be redeemed. And if this law is fairly complied with, neither the law that requires the sales, the Courts that adjudicate upon it agreeably to its spirit, and in accordance with the rules of interpretation applicable to the subject, should be held responsible for the consequences resulting from negligence or wilful omission of duty on the part of tax payers.

The next ground assumed by the counsel for the defendant, is, that the deed of the Auditor relied upon by the plaintiff, to prove title in him to the land in controversy, was not sufficient for that purpose, upon the assumption, that the law authorising the Auditor to make deeds to land sold for taxes, was repealed before this one was made, which consequently rendered it void. This is a question of considerable magni-

tude, on account of the great number of titles said to be de-pending upon its determination if for no other reason, but it is not without considerable interest, independent of this fact.

The record shows that the sale of the land in controversy, was made on the 12th day of January, 1833, and the deed therefor executed on the 8th day of November, 1833. At the time the sale was made, it is admitted that the statute authorized the Auditor to execute deeds to land sold by him for taxes; but before this deed was made, several sections of this statute were repealed, and to ascertain whether the authority of the Auditor to make deeds in pursuance of sales made by him prior to the repeal of these sections, was there-by taken from him, it will be necessary to notice the several provisions of the statute under which the sale was made, and also those of the repealing statute.

Up to 1827, the legislature had repeatedly changed the mode of selling the land of delinquent tax payers; sometimes requiring the sale to be made at the Seat of Government, by the Auditor, at another time by the sheriffs and clerks, in the respective counties in which the land lay; and according to some of the statutes upon this subject, the authority of the officer selling, to convey, by deed to the purchaser, could only be inferred from his authority to sell. The Act of 1827 required the delinquent lands to be sold at the Seat of Gov-ernment. The Act of 1829 declared the effect of the Au-ditors' deed, and otherwise modified the revenue law of 1827. In 1833, the legislature again revised the revenue law, and required the sheriffs and clerks to sell delinquent lands in their respective counties, in place of selling them at the Seat of Government by the Auditor as heretofore, and in order to effect this change, they repealed the 3d, 4th, 5th, and 27th sections of the Act of 1827, "and all other sections of this law, and all other Acts and parts of Acts, coming within said Act of 1833."

These repealed sections of the Act of 1827 related to the effect of the deed to be given, the redemption of land sold, and the disposition of that remaining unsold, and the 4th section prescribed the form of the deed which the Auditor

was required to make to the purchaser. It is also to be observed, that the 25th section of the Act of 1827 declared that "the Auditor shall make a deed to the purchaser, &c.," and that this section is not named as one of those repealed.

The question then arises, has the Act of 1833, by a repeal of the 4th section of the Act of 1827, or by the repealing clause, taken from the Auditor the authority to make a deed, after the repealing Act went into operation, to delinquent lands sold by him prior to that time.

It will be perceived, that both the 4th and 25th sections of the Act of 1827 required the Auditor to make a deed to the purchaser, and if the repeal of the one section can be regarded as the repeal of the other, it must be by implication, and this position, I think, cannot be sustained, because there is no conflict between them, nor between the 25th section and any part of the Act of 1833. The rule of construction on this subject is, that if there be two affirmative statutes, or two affirmative sections in the same statute, upon the same subject, the one does not repeal the other, if both may consist together, and we ought to seek for such a construction as will reconcile them together. 2 Wash. Va. R. 296.

This rule is directly applicable to this case. Here are two affirmative sections of the same statute, upon the same subject, but they are not opposed to each other. The 4th section of the Act of 1827 is repealed by the Act of 1833, because the duties enjoined upon the Auditor by that section are, by the Act of 1833, required thenceforth to be performed by the sheriffs, &c. But many sales had been made by the Auditor prior to the passage of that Act, where no deeds had been made by him up to that time, and the 25th section was, therefore, left unrepealed for the purpose of continuing in him the authority conferred by it, in order to carry into execution the contracts of sale previously made, by the execution of deeds agreeably to the terms thereof, and the requisitions of the law. Many rights to deed had been acquired under the Acts of 1827 and 1829, which would have been defeated by abolishing the power of the Auditor

with reference to them. It would also have violated a well settled rule of construction, that the provisions of any statute ought to receive such an interpretation, if the words and subject matter will admit of it, as that the existing rights of the public, or of individuals, be not impaired. 6 Bac. Abr. 391.

Several changes were made in the revenue law by the Act of 1833, but the principal one contemplated by the legislature was, to change the place of selling, and the officer required to sell the land of delinquent tax payers, and to effect this change, it was unnecessary to interfere with the power of the Auditor in reference to previous sales and conveyances made by him, nor have they done so. All the provisions of the Act of 1833, in reference to the manner of selling and conveying delinquent lands, and the officers upon whom this duty is devolved, are prospective in their operation, and are always so understood in all cases, where, by the terms of the Act, any discretion is allowed to the Court. It is also worthy of remark, that in declaring what shall be the duty of the clerks and sheriffs, the language of the law is, that "they shall execute all deeds of conveyance to all persons who shall become purchasers of land, at the sales made by them, which deeds shall be as near as practicable, after the form as is now required to be given by the Auditor in similar cases," thus, recognizing, at the moment of passing the Act of 1833, the existing form of the Auditor to make conveyances under the Act of 1827.

The doctrine of repeal by implication is not favored by the law, and is never resorted to, except when the repugnance or opposition is too clear and plain to be reconciled. The rule of law is, that all laws in *pari materia* are to be construed together, that no clause, sentence or word of any law, shall be superfluous or insignificant. Such a construction, therefore, as would abrogate the power of the Auditor to comply with the terms of sale, would be in direct conflict with this rule, and leave the 25th section of the Act of 1827 inoperative and void. Indeed, it would be contrary to every rule of construction, subversive of the right of third

persons, and also in opposition to the clear will of the legislature, for it is laid down as a general rule, that, in considering the extent of a power, the intention of the parties must be the guide. When, therefore, it is borne in mind that the repeal of the 25th section is not necessary to effect the objects contemplated by the Act of 1833, and is not within its purview, and as the legislature did not repeal it in terms as they have the other sections of the Act of 1827, is not the legal and reasonable inference irresistible, that they did not intend to repeal it, and thereby do a wanton act of injustice to purchasers? And this opinion is strengthened by the solicitude manifested in all their legislation to inspire confidence in, and render valid titles to land sold for taxes. It would be unjust, then, without better grounds, to impute to them an act of deceit and fraud, for, to induce the purchase of land by a promise to convey, and after the receipt of the purchase money refuse to make a title, and leave the purchaser without remedy, would be nothing less.

This question has been presented in another light, which it may be proper to notice, as it affords a conclusive argument in favor of the authority to convey.

It is not questioned that the Act of 1827 conferred upon the Auditor ample power to sell the land in question, and although this is a summary proceeding, and the Courts will scrutinize the acts and proceedings under it, yet I can see no reason why the same rules of construction that are applicable to other Acts, for the purpose of ascertaining the will of the legislature, should not be applied to such as this, for the same object; nor is there any reason to forbid the application of the rule in this, more than any other case, that every grant of power necessarily carries with it all the usual ordinary and necessary means for the exercise of that power; and if so, the authority expressly granted to the Auditor to sell, also carried with it by implication, the authority to convey; otherwise the authority to sell would be a useless and nugatory power, a mere mockery on the part of the State to delude and cheat those who should confide in her good faith. The conclusion, therefore, that the authority to convey

was implied in the authority to sell delinquent land, is fully sustained by authority.    10 Peters, 161; 18 Johns. 418; 2 Cowen, 199, 233–5.

Upon the same grounds of cotemporaneous construction and acquiescence therein that we affirm the constitutionality of the revenue law, the authority of the Auditor to make conveyances after the passage of the Act of 1833 of land sold by him before that time, under the Acts of 1827 and 1829, must also be sustained.    It is true that there has been no direct judicial affirmation of this authority, as there was of the constitutionality of the revenue law; but there has been a long and continued exercise of this power by the officer to whom its execution was intrusted by the law, and that exercise of power has been acquiesced in, alike by those interested, as by the whole community.    It has also received at least the indirect sanction of the Courts, by a recognition of the legality and sufficiency of deeds thus made, in all cases, and in every form in which they have been drawn in question. What has been said, therefore, as to the consequence and legal effect of the cotemporaneous construction which the law has received, is also applicable to the power of the Auditor to make conveyaances like the present.

But there is a constitutional ground upon which this question may be placed that, I think, is conclusive.    I admit that a Court ought not to declare a law unconstitutional, unless the opposition between it and the Constitution is direct and clear; but when such is the case, the duty of the Court is imperative, and if it should shrink from its performance, it would betray the trust confided to it.    Was it within the constitutional competence of the legislature to abolish the power of the Auditor to make a deed after the passage of the Act of 1833, to land sold prior to that time under the Act of 1827, and thereby deprive a purchaser of a deed from that officer, or any other authority competent to make a valid one?

The Constitution of the United States provides that no State shall pass any law impairing the obligation of a contract, &c.    The State Constitution contains the same prohibition upon the power of the legislature, with the difference

of the word "validity" in place of that of "obligation," used in the Constitution of the United States. Is the sale made by the Auditor of the land in question, a contract within the meaning of the Constitution? That, I think, will be manifest by adverting to the law authorizing the sale, and the action under it. In order to collect its revenue, the State authorizes the Auditor to sell the land of delinquent tax payers, that officer accordingly gives notice that he will sell all such lands at a time and place specified, and as an inducement to purchasers, the law provides that the Auditor shall give to the purchaser a certificate of purchase, or a deed, at the option of the purchaser, to the whole or such part of each tract of land as he may purchase and pay the tax due thereon. Upon these terms the land is sold, the stipulated price paid by the purchaser, and a deed therefor executed by the Auditor; but before the deed is made, the law authorizing this officer to sell and convey delinquent lands is said to be repealed, and the duty of making these sales is imposed upon other officers. The case thus stated embraces all the constituent parts of a contract, so fully and clearly as to leave no doubt as to the character of the transaction. All argument, therefore, to prove it a contract would be superfluous, and that it is such an one as is contemplated by the Constitution can, I think, be made equally clear, and if so, it follows that the legislature could not constitutionally destroy the authority of that officer to convey the land according to the terms of sale, by a repeal of the law requiring the performance of that duty. Such an act would impair the obligation of the contract, and would consequently be void.

By a series of adjudications the constitutional provision referred to has been so construed, as to protect the validity of contracts from all legislative encroachment, in any and every form in which it may be assailed. Any Act, therefore, which changes the expressed intention of the parties to a contract, or such as results from their stipulations, is held to impair its validity, and it is immaterial as to the extent, or the manner of the change, whether it be ever so minute, or

relates to its construction, its evidence, or the time or man-
ner of its performance, the conclusion is the same.   Every
conceivable change of a contract impairs its validity, and
renders it null and void.   3 Story on Const. §§ 13 and 5;
3 Peters' Cond. R. 395; 2 do. 308; 5 do. 369; 3 do. 295.
This constitutional provision extends to and embraces both
contracts executed and executory, and as well those entered
into by a State, as those made by individuals.   And in a
leading case upon this subject, it has been held by the Su-
preme Court of the United States, that a legislative grant is
a contract within the meaning of the Constitution, and that
a subsequent Act of the legislature repealing it was null
and void for that reason.   *Fletcher* v. *Peck*, 2 Peters' Cond.
R. 308–20; Story's Com. §§ 1379, 1385.

It is insisted, however, by the counsel for the defendant,
that the subsequent Act of the legislature, which repealed
the 4th section of the Act, which requires a conveyance to
be made to the purchaser, is not in conflict with the Con-
stitution, because it operates only upon the remedy of the
purchaser, and not upon the obligation of the contract,
and numerous authorities are referred to for the purpose of
sustaining this position, but they totally fail to do so.   The
execution of a deed to the purchaser by the Auditor, at the
time, and in the form prescribed by the law, is as much a
part of the contract as any other portion of it.   It is one of
the stipulations contained in the' law, as an inducement to
the purchase of the land, and from its importance as con-
firming and evidencing title, it cannot be doubted was in the
contemplation of the purchaser, at the time he made the
contract.   It, therefore, enters into and forms a part of the
binding obligation of the contract, as much as the agreement
of the purchaser to pay the price of the land at which it was
bid off by him.   2 Howard's ( U. S.) R. 608.

It is not controverted that the legislature may change the
nature and extent of the remedy by which a contract, and
the rights of parties, may be enforced.   But the cases re-
ferred to by the counsel for the defendant, to justify the
repeal insisted upon, are such as affect vested rights, which

are not secured by any constitutional provision, by reason of their not vesting under a contract, or such as take away a peculiar privilege, conferred by a prior Act, or the repeal of a penal or criminal law, by which the jurisdiction of the Court is divested, before any right under it has ripened into a contract, or vested interest. The authority to either repeal or modify according to their nature these pre-existing laws is admitted. There is also another class included in the reference, recording and limitation laws, in relation to which a great stretch of legislative power is allowed, yet, even with regard to them, it is not without its limit.

The obligation of a contract is that which obliges a party to perform his contract, or repair the injury done by a failure to perform, and as regards the remedy, it may be modified by the legislature, but not entirely abolished, for, in substituting one mode of proceeding for another, they must afford a reasonable remedy. An Act that should wholly extinguish all existing remedy so as to leave no redress, and no means of enforcing a contract, would, by operating *in presenti*, impair its obligation. 1 Howard's (U. S.) R. 311, 316, 317; 5 Peters' Cond. R. 369, 373, 374. If, therefore, the Act of 1833 be regarded as abolishing the power of the Auditor to make the deed in question, it is equally obnoxious to the constitutional prohibition, whether it is considered as operating upon the obligation, or the remedy upon the contract, because it extinguishes all redress, by taking from the purchaser all remedy against the only one who had authority to make the conveyance, without substituting any one in his place for that purpose, which might have been done; for it is not contended that there is, or can be a vested right in a particular remedy, or in a special mode of administering it. In these, then, there is no vested right, but there is such a right in some substantial and efficient remedy, and that right is as much within the protection of the Constitution, as the obligation of the contract. The Act, therefore, that takes away the old remedy, as is contended has been done in this case, without providing a new one, is repugnant to the Constitu-

tion, and void.    3 Story's Com. 1379, 1375; 4 Littell, 42, 56; 6 Wend. 526; 4 Cowen, 384.

It has been suggested by counsel that the legislature would make a deed upon a proper application; but that is not an adequate remedy, the grant of which depends upon the will of the legislature.   "When," says Judge Story, "we speak of the obligation of a contract, we include in the idea some known means acknowledged by the municipal law to enforce it."

It is also a well settled principle, that the repeal of a law in which a contract consists, is an infringement of the Constitution.   A legislative grant is a contract of this description, and so is the one under consideration so far as relates to the conveyance.   A repeal, therefore, of that part of the law that provides for a conveyance would impair to that extent, the obligation of the contract.   Whatever diversity of opinion, therefore, there may be as to how far the existing law enters into, and forms part of a contract between individuals as a general rule, I think there can no question but it does so in this case, and that the purchaser's title to a deed cannot be taken from him by the repeal of a law that forms part of the contract.   If it was otherwise, then every executory contract entered into by the State, or its officers on her behalf, in virtue of an Act of the Legislature, may be avoided by them at discretion, although the terms of the contract have been complied with by the other contracting party.   2 Peters' Cond. R.   308, 457; 3 do.  295, 418; 4 do. 526, 539, 555; 3 Story's Const. 1385.

The second assignment of error is, that the Court erred in deciding that the plaintiff's right of recovery was not barred by the Statute of Limitations.

This assignment of error can be disposed of in a few words.   The Statute of Limitations that went into operation the 1st day of June, 1835, provides that, "any person having color of title made in good faith to vacant and unoccupied land, who shall pay the taxes legally assessed thereon for seven successive years, shall be deemed to be the legal owner, &c."

Bruce *v.* Schuyler *et al.*

In this case, the defendant had been in possession and paid the taxes for seven years prior to the commencement of this action, but seven years had not intervened between the commencement of the operation of this statute, and the commencement of this action. The possession of the defendant commenced after the passage of the statute, but before it went into effect, and between the time when the statute took effect and the bringing of this action, there was less than seven years intervening.

This statute declares that seven years' possession, &c., shall confer title, but it is obvious that as it is by virtue of this statute that the title is acquired, that the possession must be under it, and that until the statute has been in operation seven years, no title can be perfected under and by virtue of it. It is insisted, however, that inasmuch as the possession of the defendant commenced after the passage of the Act, that seven years from that time should bar the plaintiffs' title. This distinction would escape the injustice, and I might say the absurdity, of supposing that seven years' possession that terminated, and was complete but the day after the statute took effect, would mature a title under it. But either construction would violate well established legal principles, for no rule of interpretation is better settled, than that no statute shall be allowed a retrospective operation, unless the will of the legislature to that effect is declared in terms so plain and positive, as to admit of no doubt, and this case is a good illustration of the wisdom of the rule. By giving the statute a retrospective operation, many who were relying confidently upon the existing law, might, in a few months, or even days after its passage, be deprived of all title to their land. Law is a rule of conduct, but how can that be said to be a rule to govern our conduct, or to affect our rights to-day, which is only to-day announced as a rule which shall thus govern our conduct, &c., ten days hence. This point is too well settled by authority, to require further comment. This very question has been decided by this Court, in the case of *Rhinehart* v. *Schuyler*, 2 Gilm. 473, and the same

principle has been affirmed in numerous adjudications of other Courts.

The judgment of the Court below is affirmed with costs.

The following separate opinion was delivered by

PURPLE, J. I fully concur in opinion with the majority of the Court, in affirming and reversing the above judgments. I am, however, constrained to dissent upon one point. Whatever my individual opinion may have been upon the question of the constitutionality of the former revenue law of this State, I consider the question no longer an open one. It has been settled by repeated decisions of this Court, and should not again be agitated. But upon the point of the repeal of the law of the 19th February, 1827 by the Act of February 28th, 1833, I think the judgment of the Court is wrong. I may admit, that it was not intended by the legislature, but yet I cannot concede that they have not done it. I regard the 4th section of the Act of 1827 as the only one which confers any authority upon the Auditor to make a deed. In this alone the power is given, and the form of the deed prescribed. It provides that the purchaser, on presenting the Treasurer's receipt for the payment of the money, shall be entitled to receive, at his option, either a certificate of purchase or a deed in the following form, to wit: (here follows the form of the deed to be made by the Auditor.) If the 25th section is examined, it will be found that it confers no new power, but was only passed with the intention and design of regulating the exercise of one already supposed to exist. It is as follows: "All sales of lands for taxes, whether by the Auditor or Sheriff, the officer selling the same, shall, previous to the sale, designate in what part of the tract the part sold shall be located, and shall make his deed accordingly." Clearly, to my mind, this provision pre-supposes that the Auditor has already authority to make the deed, and was only enacted for the purpose of defining the specific duties of the officer in the execution of a power already conferred by law.

I agree to the affirmance and reversals of the judgments, because I believe that independent of any legislative enactment to that effect, the power to sell necessarily carries with it, by implication, authority to make a deed for the land so sold; and for the reason, that the purchase under the law which requires the Auditor to make a deed, is a contract between the State and such purchaser; that the law under which such contract is made, is a part of the contract itself, and that the same cannot be unconditionally repealed, without a violation of the obligation of the contract, and a consequent infringement of the 10th section of the 1st article of the Constitution of the United States.

TREAT, J. said: I concur in the views expressed by Mr. Justice Purple.

*Judgment affirmed.*